# No. 22-2689

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

LEONID FALBERG, AS REPRESENTATIVE OF A CLASS OF SIMILARLY SITUATED PERSONS, AND ON BEHALF OF THE GOLDMAN SACHS 401(K) PLAN,

*Plaintiff-Appellant,*

v.

THE GOLDMAN SACHS GROUP, INC., THE GOLDMAN SACHS 401(K) PLAN RETIREMENT COMMITTEE,

*Defendants-Appellees,*

JOHN DOES 1-20,

*Defendants.*

Appeal from the United States District Court
for the Southern District of New York (Case No. 19-cv-9910)
The Honorable Edgardo Ramos

**APPELLANT'S OPENING BRIEF AND SPECIAL APPENDIX**

[*counsel listed on inside cover*]

Brock J. Specht
Paul J. Lukas
Benjamin J. Bauer
NICHOLS KASTER, PLLP
80 South Eighth Street
4700 IDS Center
Minneapolis, MN 55402

Adam W. Hansen
   *Counsel of Record*
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401
(612) 927-2969
adam@apollo-law.com

*Counsel for Appellant*

**APPELLANT REQUESTS ORAL ARGUMENT**

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION...............................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT..................1

STATEMENT OF THE ISSUES.................................................................3

STATEMENT OF THE CASE ...................................................................4

I.     FACTUAL BACKGROUND ..............................................................5

     A.    The Parties ...............................................................................5

     B.    The Plan's High-Fee Proprietary Investments......................6

          (1)    Goldman failed to offer less expensive separate accounts or CITs on its proprietary funds ....................7

          (2)    Goldman failed to seek rebates that would have decreased costs to Plan participants............................9

     C.    GSAM's Poor Ratings and Underperformance .....................11

     D.    The Committee's Conflicted Process ....................................13

     E.    Goldman's Belated Removal of the GSAM Funds...............17

II.    PROCEDURAL HISTORY ..............................................................19

STANDARD OF REVIEW.......................................................................20

ARGUMENT ............................................................................................21

I.     THE COURT ERRED IN GRANTING JUDGMENT FOR APPELLEES ON FALBERG'S BREACH-OF-FIDUCIARY-DUTIES CLAIMS...........................................................................21

     A.    ERISA Requires Fiduciaries To Act with Complete Loyalty to Plan Participants.................................................21

i

B.    ERISA Requires Fiduciaries To Act with Care, Skill, Prudence, and Diligence in Selecting and Maintaining Investment Funds ................................................. 23

C.    ERISA Breach-of-Fiduciary Duties Claims Are Fact-Laden and Context-Specific; Summary Judgment Is Therefore Rarely Appropriate ............................... 24

D.    Goldman Breached Its Duty of Loyalty ............................... 25

    (1)    Goldman and the Committee failed to control their conflicts of interest.......................................... 25

    (2)    Goldman used a far less rigorous selection standard for GSAM funds ........................................... 26

    (3)    Goldman used more expensive investment vehicles for GSAM funds ............................... 28

    (4)    Goldman failed to secure fee rebates for GSAM mutual funds ................................................. 29

    (5)    Goldman tolerated underperformance in proprietary funds when it did not with nonproprietary funds .................................... 29

    (6)    Goldman's belated removal of GSAM funds demonstrated that it prioritized its self-interest ....... 31

E.    Goldman Breached Its Duty of Prudence ........................... 32

    (1)    Goldman lacked any formal criteria for selecting and monitoring plan investments ................................ 32

    (2)    Goldman lacked appropriate methods to evaluate the high fees of proprietary mutual funds.................. 35

    (3)    Goldman failed to use appropriate methods to investigate alternative options.................................... 37

    (4)    Goldman did not appropriately monitor proprietary funds ......................................... 38

(5)    Goldman failed to remove the proprietary funds in a timely manner ........................................... 40

II.   THE COURT ERRED IN GRANTING JUDGMENT ON FALBERG'S PROHIBITED-TRANSACTIONS CLAIMS ............ 42

    A.    ERISA Forbids Certain Prohibited Transactions by Interested Parties ................................. 42

    B.    Goldman Does Not Qualify for PTE-77-3's Exception .......... 43

III.  THE COURT ERRED IN GRANTING JUDGMENT FOR GOLDMAN ON FALBERG'S FAILURE-TO-MONITOR-FIDUCIARIES CLAIM .................................... 49

IV.  THE DISTRICT COURT ERRED IN DISMISSING FALBERG'S MOTION TO COMPEL AS MOOT ......................... 50

CONCLUSION ........................................ 51

CERTIFICATE OF COMPLIANCE ...........................................

SPECIAL APPENDIX ....................................

iii

# TABLE OF AUTHORITIES

## CASES

*Baird v. BlackRock Institutional Tr. Co., N.A.*,
  403 F. Supp. 3d 765 (N.D. Cal. 2019) .................................................. 26

*Bedrick v. Travelers Ins. Co.*,
  93 F.3d 149 (4th Cir. 1996) ........................................................... 26-27

*Bell v. Pension Comm. of ATH Holding Co.*,
  2019 WL 387214 (S.D. Ind. Jan. 30, 2019) ......................................... 37

*Bd. of Trs. of S. Cal. IBEW-NECA Defined Contribution Plan
  v. Bank of N.Y. Mellon Corp.*,
  2011 WL 6130831 (S.D.N.Y. Dec. 9, 2011) ..................................... 24-25

*Brotherston v. Putnam Inv., LLC*,
  907 F.3d 17 (1st Cir. 2018) ...................................................... 44, 46-48

*Brotherston v. Putnam Inv., LLC*,
  2017 WL 1196648 (D. Mass. Mar. 30, 2017) ...................................... 46

*Cates v. Trs. of Columbia Univ.*,
  2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019) ....................................... 42

*Cryer v. Franklin Res., Inc.*,
  2018 WL 6267656 (N.D. Cal. Nov. 16, 2018) ..................... 43-44, 47-48

*Cunha v. Ward Foods, Inc.*,
  804 F.2d 1418 (9th Cir. 1986) ........................................................... 22

*Dardaganis v. Grace Cap.*,
  889 F.2d 1237 (2d Cir. 1989) ............................................................ 33

*Durakovic v. Bldg. Serv. 32 BJ Pension Fund*,
  609 F.3d 133 (2d Cir. 2010) .............................................................. 20

*Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*,
  805 F.2d 732 (7th Cir. 1986) ............................................................. 49

iv

*Fuller v. Suntrust Banks, Inc.*,
    2019 WL 5448206 (N.D. Ga. Oct. 3, 2019) ........................ 26, 31, 38, 41

*Garthwait v. Eversource Energy Co.*,
    2022 WL 3019633 (D. Conn. July 29, 2022) ................................ 34, 40

*George v. Kraft Foods Glob., Inc.*,
    641 F.3d 786 (7th Cir. 2011) .............................................................. 42

*Goldman Sachs 401(k) Plan Ret. Comm. v. Falberg*,
    No. 22-404, 2022 WL 4126112 (2d Cir. June 29, 2022) ..................... 19

*Harris v. Provident Life & Accident Ins. Co.*,
    310 F. 3d 73 (2d Cir. 2022) ................................................................ 25

*Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*,
    530 U.S. 238 (2000) ............................................................................ 42

*Hughes v. Northwestern Univ.*,
    142 S. Ct. 737 (2022) ..................................................................... 23-24

*Hugler v. Byrnes*,
    247 F. Supp. 3d 223 (N.D.N.Y. 2017) ............................................... 23

*In re Chateaugay Corp.*,
    76 B.R. 945 (S.D.N.Y. 1987) ............................................................. 22

*In re M&T Bank Corp. ERISA Litig.*,
    2018 WL 4334807 (W.D.N.Y. Sept. 11, 2018) ................................... 43

*In re Polaroid ERISA Litig.*,
    362 F. Supp. 2d 461 (S.D.N.Y. 2005) ............................................... 49

*Johnson v. Killian*,
    680 F.3d 234 (2d Cir. 2012) .............................................................. 21

*Leigh v. Engle*,
    727 F.2d 113 (7th Cir. 1984) ............................................................. 49

*Liss v. Smith*,
    991 F. Supp. 278 (S.D.N.Y. 1998) ................................................ 34, 50

*Lowen v. Tower Asset Mgmt., Inc.*,
    829 F.2d 1209 (2d Cir. 1987) ............................................................ 43

*Martin v. Feilen*,
    965 F.2d 660 (8th Cir. 1992)....................................................... 38, 49

*McGinnes v. FirstGroup Am., Inc.*,
    2021 WL 1056789 (S.D. Ohio Mar. 18, 2021) ...............................22-23

*Moreno v. Deutsche Bank Ams. Holding Corp.*,
    2018 WL 2727880 (S.D.N.Y. June 6, 2018)....................... 22, 32, 43, 47

*Pegram v. Herdrich*,
    530 U.S. 211 (2000) ........................................................................2, 22

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*
*Inc.*,
    712 F.3d 705 (2d Cir. 2013) ................................................................ 24

*Pizarro v. Home Depot, Inc.*,
    2022 WL 4687096 (N.D. Ga. Sept. 30, 2022) ................................40-41

*Ramos v. Banner Health*,
    2019 WL 1777524 (D. Colo. Apr. 23, 2019) ........................................ 42

*Rothstein v. Am. Int'l Grp., Inc.*,
    837 F.3d 195 (2d Cir. 2016) ....................................................3, 22, 32

*Sacerdote v. N.Y. Univ.*,
    9 F.4th 95 (2d Cir. 2021)................................................................24, 34

*Sacerdote v. N.Y. Univ.*,
    1-16-cv-06284 (S.D.N.Y. Feb. 22, 2018) ............................................. 41

*Sims v. BB&T Corp.*,
    2018 WL 3128996 (M.D.N.C. June 26, 2018) ..................................... 41

*Stegemann v. Gannett Co., Inc.*,
    970 F.3d 465 (4th Cir. 2020)............................................................... 38

*Sweda v. Univ. of Pennsylvania*,
    923 F.3d 320 (3d Cir. 2019) ........................................................33, 36

vi

*Tatum v. RJR Pension Inv. Comm.*,
    761 F.3d 346 (4th Cir. 2014).................................................24, 31, 38

*Terry v. Ashcroft*,
    336 F.3d 128 (2d Cir. 2003) ...........................................................20-21

*Tibble v. Edison Int'l*,
    575 U.S. 523 (2015) ........................................................................23, 38

*Tracey v. Mass. Inst. of Tech.*,
    404 F. Supp. 3d 356 (D. Mass. 2019)....................................................25

*Tussey v. ABB, Inc.*,
    850 F.3d 951 (8th Cir. 2017)..................................................................31

*Vellali v. Yale Univ.*,
    2022 WL 13684612 (D. Conn. Oct. 21, 2022)................34, 36-37, 41-42

## STATUTES

28 U.S.C. § 1291.....................................................................................1

28 U.S.C. § 1331.....................................................................................1

29 U.S.C. § 1001.................................................................................1, 5

29 U.S.C. § 1104.............................................................2-3, 22-23, 33

29 U.S.C. § 1106.....................................................................2-4, 42

29 U.S.C. § 1109..................................................................................19

29 U.S.C. § 1132.............................................................................1, 19

## RULES

Fed. R. Civ. P. 56 .................................................................................20

Prohibited Transaction Exemption 77-3, 42 Fed. Reg. 18,734
(Apr. 8, 1977) .......................................................2, 4, 20, 43-49

29 C.F.R. § 2509.75-8, FR-17 ..................................................................50

# OTHER AUTHORITIES

DOL Advisory Op. No. 88-16A, 1988 WL 222716 (Dec. 19, 1988)..............
.................................................................................................... 22,28

DOL Advisory Op. 2013-03A (ERISA July 2013), 2013 WL 3546834
.......................................................................................................... 36

1

2

3

4

5

7

10

12

14

15

18

19

28

31

37

41

42

47

48

49

Dated: January 31, 2023   Respectfully submitted,


       s/ Adam W. Hansen
       Adam W. Hansen
        *Counsel of Record*
       APOLLO LAW LLC
       333 Washington Avenue North
       Suite 300
       Minneapolis, MN 55401
       (612) 927-2969
       adam@apollo-law.com

       Brock J. Specht
       Paul J. Lukas
       Benjamin J. Bauer
       NICHOLS KASTER, PLLP
       4700 IDS Center
       80 South Eighth Street
       Minneapolis, MN 55402


       *Counsel for Appellant*

51

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Second Circuit Local Rule 32.1(a)(4)(A) because the brief contains 10,991 words, as determined by the word-count function of Microsoft Word 2016, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

Dated: January 31, 2023                       s/ Adam W. Hansen

                                              Adam W. Hansen

# SPECIAL APPENDIX

# TABLE OF CONTENTS

Opinion and Order dated September 14, 2022 (ECF No. 256) ...... S.A.001

Judgment dated September 15, 2022 (ECF No. 257) ................... S.A.035

28 U.S.C. § 1331 ............................................................. S.A.036

29 U.S.C. § 1132 ............................................................. S.A.037

28 U.S.C. § 1291 ............................................................. S.A.038

29 U.S.C. § 1104 ............................................................. S.A.039

29 U.S.C. § 1106 ............................................................. S.A.041

29 U.S.C. § 1109 ............................................................. S.A.043

29 U.S.C. § 1113 ............................................................. S.A.044

29 C.F.R. § 2509.75-8 ..................................................... S.A.045

42 Fed. Reg. 18,734 (Apr. 8, 1977) ................................. S.A.046

DOL Advisory Op. No. 88-16A, 1988 WL 222716 (Dec. 19, 1988). S.A.048

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>
Leonid Falberg, as representative of a class of similarly situated persons, and on behalf of the Goldman Sachs 401(k) Plan,

          Plaintiff,

          v.

The Goldman Sachs Group, Inc., The Goldman Sachs 401(k) Plan Retirement Committee, and John Does 1-20,

          Defendants.
</td><td>

**OPINION AND ORDER**

19 Civ. 9910 (ER)
</td></tr>
</table>

Ramos, D.J.:

    Leonid Falberg, a participant in the Goldman Sachs 401(k) Plan (the "Plan"), brings this putative class action on behalf of the Plan and those similarly situated. Falberg alleges violations of the Employment Retirement Income Security Act of 1974 ("ERISA") by the Plan's sponsor, The Goldman Sachs Group, Inc., and the Plan's managers, The Goldman Sachs 401(k) Retirement Committee and its members John Does 1-20 (collectively "Defendants").

    Defendants move for summary judgment on all claims. Falberg separately moves for partial summary judgment only on the issues of loss and loss causation. Also before the Court are Falberg's motion to compel certain documents designated as privileged; Defendants' motion to strike certain opinions of Dr. Brian C. Becker, Falberg's expert; and Defendants' motion to compel arbitration of certain class members.

    For the reasons set forth below, Defendants' motion for summary judgment is GRANTED; Falberg's motions for partial summary judgment and to compel documents are DENIED; and Defendants' motions to strike and to compel arbitration are DENIED.

## I.  BACKGROUND[1]

### a.  The Plan

Goldman Sachs sponsors a defined-contribution 401(k) plan for eligible employees.  Doc. 227 ¶ 1.  Participants in the Plan are responsible for directing the investments in their accounts. *Id.* ¶ 3.  During the class period, October 25, 2013, to June 6, 2017, Plan participants could set up their accounts either through a "target date fund," based on a target retirement date, or by selecting funds from a menu of 35 single-strategy investment options.[2]  *Id.* ¶ 4.  Falberg worked for Goldman Sachs from 1999 until 2008 and has participated in the Plan since 1999.  Doc. 228 ¶ 1.  During the class period, less than one third of the Plan's investment options were managed by Goldman Sachs Asset Management ("GSAM"), an investment manager with over $1.5 trillion of assets under supervision (as of 2018).  Doc. 227 ¶¶ 5–6.

Falberg challenges the availability of five proprietary mutual funds managed by GSAM—the Mid Cap Value Fund, Large Cap Value Fund, High Yield Fund, Core Fixed Income Fund, and Short Duration Government Fund—as investment options in the Plan.[3]  *Id.* ¶ 2.  These

---

[1] These facts are taken from the parties 56.1 statements and counterstatements, which are collected at Docs. 227—"Defendants' Reply to Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts and Defendants' Statement of Additional Material Facts as to Which There is no Genuine Dispute"—and 228—Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Additional Material Facts."

[2] As of July 31, 2013, the Plan held 12 mutual funds, seven collective investment trusts ("CITs"), and 15 separate accounts on the single-strategy menu.  Doc. 228 ¶ 76.  Of the 12 mutual funds, seven were managed by Goldman Sachs.  *Id.*  All the challenged GSAM funds were retained as mutual funds.  *Id.*

[3] On this point, while Falberg admits that his complaint does not "explicitly challenge" two other GSAM funds—the Emerging Markets Equity Fund and the Strategic Income Fund—he denies that Defendants had a prudent process for selecting these funds or for evaluating investment vehicles for those funds.  These denials are beside the point, as in his reply memorandum in support of class certification, Falberg expressly stated that he "does not object to limiting the class to persons who invested in the five funds referenced in the [c]omplaint."  Doc. 114 at 10 n.19.  And thereafter this Court did limit the certified class to Plan participants whose Plan account held the Large Cap Value Fund, the Mid Cap Value Fund, the High Yield Fund, the core Fixed Income Fund, and/or the Short-Duration Government Fund.  Doc. 163 at 25.  As such, the Emerging Market Equity and Strategic Income Funds are not at issue here.

2

five funds were included in the Plan's investment menu from before 2013 until their removal in 2017.  Doc. 228 ¶ 4.

### b.  The Committee's Process for Managing the Plan

The Retirement Committee is the named fiduciary under the Plan responsible for selecting and monitoring Plan investment options.  Doc. 227 ¶ 9.  During the class period, the Committee consisted of 10 to 12 sophisticated financial professionals who held senior positions at Goldman Sachs.[4]  *Id.* ¶ 10.  According to Falberg's expert Marcia Wagner, the Retirement Committee members were "consummate financial professionals," with a "deep expertise in the markets."  *Id.* ¶ 11.  She also stated that the Committee members' experience "compares favorably" to those of other large plan committees, the "vast majority" of "whose members[] possess[] a limited investment knowledge" and/or expertise.  *Id.*[5]  The Retirement Committee was assisted by a full-time, highly-qualified secretary, Cheryl Mintzer, who received an MBA from Columbia Business School and is a Chartered Financial Analyst with extensive industry experience.  *Id.* ¶ 15.  The

---

[4] Falberg claims to dispute the "nature of each [] Committee member's 'sophistication,'" *see* Doc. 227 ¶ 10, but does not point to any evidence suggesting the Committee members were unsophisticated or lacked expertise.  Instead, Falberg quotes from his expert Marcia Wagner, who opined that Defendants' expert Eileen Kamerick "fail[ed] to highlight any specific examples of the Committee applying [its knowledge]" with respect to managing the challenged funds.  *Id.*  And, Falberg adds that his expert, William Fender, testified that "there is no correlation . . . that because somebody is involved in financial services and because they have degrees or advanced certifications . . . that they actually know what's involved in the prudent management of an investment portfolio."  Fender further testified that "just because somebody is in financial services, doesn't mean that they have the necessary expertise and background to act as a prudent ERISA fiduciary."  None of these challenges amount to a dispute over the Committee's sophistication:  first, Wagner does not dispute that the Committee *had* knowledge and expertise but instead objects that it did not properly *apply* those; in any event, Wagner testified that the members of the Committee were "sophisticated financial professionals."  *Id.*  Second, Felder's testimony is at most general speculation about a disconnect that may exist between the Committee members' qualifications and the ability to prudently manage investment portfolios, and does not speak to—or controvert—the experience or sophistication of the Committee members.

[5] Falberg points to Wagner's testimony as evidence of a dispute over the Committee's expertise, but, again, Wagner does not contest that the Committee members were "consummate professionals."  *Id.* ¶ 11.  Instead, she notes she observed a "disconnect" between their "financial professionalism" and "how [] they use[d] that financial professionalism."  *Id.*  In other words, there is no dispute that the Committee members had "deep expertise;" Wagner objects only to their exercise of that expertise.

3

Committee also was assisted by Alan Wilmit, an experienced, highly-qualified ERISA counsel at Goldman Sachs.  *Id.*  ¶ 16.  Wilmit attended each of the Committee's meetings during the class period.  *Id.* ¶ 17.[6]

Upon joining the Committee, each new member participated in a one-on-one training session with Goldman Sachs' senior ERISA counsel covering a range of topics, including fiduciary responsibilities, ERISA's prohibited transaction rules, conflicts of interest, and disclosure obligations.[7]  *Id.* ¶¶ 20–21.  Committee members also received periodic training about their fiduciary responsibilities at Committee meetings, as well as updates on legal and regulatory developments.  *Id.* ¶ 24.  Retirement Committee member Dean Backer testified that Committee members were trained to treat the GSAM funds "exactly the same, as equals [to the other] plan options."  *Id.* ¶ 26.

The Committee also hired an investment advisor, Rocaton Investment Advisors LLC ("Rocaton"), as a fiduciary to provide the Committee with investment advice.  *Id.* ¶ 27.  Rocaton provided the Committee with, among other things, (1) information about each of the Plan's investment options, including monthly and quarterly performance reports, (2) written reports summarizing Rocaton's meetings with investment managers, (3) Rocaton's commentary on different investment options and industry trends, and (4) other information periodically requested by the Committee.  *Id.* ¶¶ 44–47.

---

[6] Wagner opines that the Committee should have considered appointing independent members who were not employees of Goldman Sachs or its affiliates.  *Id.* ¶ 18.  However, when asked if she was aware of a single 401(k) plan that had retained an independent fiduciary to resolve any alleged conflict of interest, she testified "I just don't know.  I can't answer either way."  *Id.*

[7] Falberg objects that Defendants did not produce any documents detailing these training sessions, but this is controverted by the record, which, as Defendants point out, includes emails and an expert report relating to the training sessions.  *See* Doc. 227 ¶ 21.  Falberg's further objection that there is no indication the trainings included ERISA's prohibited transaction rules also is controverted by the record.  *See id.*

4

During the class period, Rocaton assigned one of five ratings to the mutual funds that it covered: "buy," "hold," "not broadly recommended," "sell," and "under construction." Doc. 227 ¶ 31; Doc. 228 ¶ 62. These were ratings that Rocaton made available to all its clients. *Id.* ¶ 32. According to Falberg's expert William Fender, Rocaton's "not broadly recommended" rating means that "a fund is average (or worse) within its peer group." ¶ 33. Fender also stated that a "not broadly recommended" rating "is far from a strong vote of confidence." *Id.* Still, according to Rocaton, a fund with "not broadly recommended" rating nonetheless "may be suitable for some clients based on their specific objectives." *Id.* ¶ 34.

As Anne Buehl, one of Rocaton's co-founders and advisor to the Plan since 1998, explained, Rocaton's "not broadly recommended" rating was "*not* a recommendation by Rocaton to remove a fund as an investment option." Instead, Rocaton mentioned a "sell" rating for that purpose. *Id.* ¶ 35. Buehl also testified that many of Rocaton's clients held investments that Rocaton had rated "not broadly recommended," and that "Rocaton believed it was appropriate for clients to invest in funds that had received a 'not broadly recommended' rating[.]"[8] *Id.* ¶¶ 36–37.

According to Buehl, Rocaton's ratings were only a small part of the information that Rocaton provided to the Committee about the Plan's investment options.[9] *Id.* ¶ 43. During the

---

[8] Falberg notes Buehl did not name any particular clients that retained "not broadly recommended" investments, but does not point to any evidence controverting her testimony that many of Rocaton's clients held such investments. Falberg also argues, here, that Buehl's "credibility is in serious doubt," but, as Defendants note, does not provide a proper evidentiary basis for such a claim. *See* Doc. 227 ¶ 37.

[9] Falberg does not dispute that Rocaton provided the Committee a range of other information—beyond the ratings—on the Plan's investment options, but instead contends that this additional information should be considered part and parcel of the ratings. In other words, Falberg argues Rocaton considered other information so as to arrive at its ratings and that, as such, the ratings are reflective of—not apart from—the additional information Rocaton considered. But Falberg's expert Wagner testified that she did not say, imply, or intend to imply that "manager ratings w[ere] the end-all and sole output or product of Rocaton," Doc. 227 at ¶ 43. In any event, Falberg's objection does not change the fact that Rocaton considered and produced to the Committee a range of information on investment options, including its ratings.

5

class period, Rocaton provided the Committee with quantitative and qualitative reviews of each

of the Plans' investment options, including monthly and quarterly performance reports that

showed quarterly, year-to-date, 1-year, 3-year, 5-year, 7-year, and 10-year performance compared

to index benchmarks and mutual funds peers.[10]  *Id.* ¶ 44.  Also during the class period, Rocaton

provided the Committee with a "one-page snap shot" for each option that included a product

description, total product and Plan assets, fees, a quarterly performance update, portfolio

characteristics, and commentary, as well as analyses of the management fees charged by each of

the Plan's investment options, including comparisons of those fees to peer-group averages across

different investment vehicle types.  *Id.* ¶¶ 45–46.  Rocaton also provided other information

requested by the Committee, including monthly reports on the performance of each Plan

investment option.  *Id.* ¶ 47.

     The Retirement Committee met quarterly and also held *ad hoc* meetings, including eight

*ad hoc* meetings during the class period.  *Id.* ¶ 49.  Rocaton attended each of the Committee's

quarterly meetings during the class period.  *Id.* ¶ 50.  Rocaton generally began each quarterly

meeting of the Retirement Committee by presenting information about Plan performance and

fielding questions from Committee members.[11]  After Rocaton's presentation at the beginning of

---

[10] Falberg generally takes issue with the level of detail in these reports but does not dispute that Rocaton produced them.  Doc. 227 ¶ 44.

[11] Falberg does not dispute that Rocaton began each meeting by presenting information about Plan performance, but broadly objects to the depth and detail of these presentations.  Specifically, Falberg speculates that the Committee may have spent "less than a minute" discussing each investment option at its meetings, and objects that during much of the class period, meeting minutes contained little to no detail on the challenged funds and instead are made up of more generic language.  *See* Doc. 228 ¶¶ 50–52, 140–41, 145–59.  Falberg further notes this general language is repeated in numerous minutes.  *Id.* ¶ 52.

In any event, Falberg's expert Wagner previously has acknowledged that meeting "minutes do not need to be lengthy" and testified that "the documentary file doesn't have to be verbatim" and "more robust" minutes "are not an affirmative duty, per se."  Doc. 227 ¶ 51.  Falberg also disputes whether the Committee asked questions, but does not point to any evidence showing they did not.  *See id.*

its quarterly meetings, the Committee often heard presentations from investment managers of current or prospective Plan investment options. *Id.* ¶ 53.

With respect to Rocaton's presentations, Committee Co-Chair Paula Madoff testified that Rocaton "would go through their book;" she also testified she "didn't know how much time was spent specifically on . . . the particular reporting," and that Rocaton "would be more likely to talk about what was happening in the markets and trends and things like that . . . ." Doc. 228 ¶ 49. And as to the review of the quarterly reports, Committee Co-Chair Joseph Gleberman testified that at each meeting "Rocaton would go through the report and point out whatever highlights they felt were particularly relevant;" in all, Gleberman estimated the discussion was "15 to 30 minutes." *Id.* ¶ 50. Gleberman also testified that Committee members "were expected to have read the material before they got to the meeting." *Id.* Wagner testified that the amount of time that the Committee devoted to reviewing the Plan's investments and Rocaton's ratings at Committee meetings "would not have been enough to have meaningful conversations about the Plan's investments." *Id.* ¶ 51.

### c. Treatment and Removal of the GSAM Funds

Committee members uniformly testified that they applied "no different standard for [GSAM] funds than for any other fund in the plan." Doc. 227 ¶¶ 59–63. In particular, Committee Co-Chair Jeffrey Goldenberg testified that the Retirement Committee employed "[t]he same format of evaluation . . . whether [the fund] was internal or external" and did not "treat[] proprietary funds any differently." *Id.* ¶ 60. And, Committee Co-Chair Paula Madoff testified that the Committee "evaluated each investment [option] on its merits," and that it gave GSAM funds "no preferential treatment at all." *Id.* ¶ 61. Goldman Sachs's senior ERISA counsel, Alan Wilmit testified that the Committee was "very careful to treat those funds the same

S.A.007

as they treat third parties[.]"  *Id.* ¶ 62.  At the same time, Falberg's expert Fender opined that "there is no serious question that it was a conflict of interest for the GSAM funds to be included in the Plan," and that the "real issue here is whether the [] Committee properly managed the conflict[.]"  Doc. 228 ¶ 104.

In the years before the start of the class period, three of the challenged funds, the Large Cap Value Fund, Mid Cap Value Fund, and High Yield Fund, repeatedly underperformed benchmark indices.  In particular, the Mid Cap Value and High Yield Funds underperformed their benchmarks in 2009, and the Large Cap Value and High Yield Funds underperformed their benchmarks in 2010.  *Id.* ¶¶ 97–98.  And, in 2011, each of the three funds underperformed its benchmark index.  *Id.* ¶ 99.

As a result of these, in November 2010, the Committee asked Rocaton to conduct an evaluation of the performance of five GSAM funds, including three of the funds at issue here—Mid Cap Value Fund, High Yield Fund, and Short Duration Government Fund—and, specifically, to compare their performance to those of the funds included on a "Buy" list Rocaton maintained for its clients.  *Id.* ¶¶ 69–70.  With respect to the three challenged funds, the 2010 review showed that over 3- and 5-year periods, those funds performed above median or at median.[12]  *Id.* ¶ 71.  Following Rocaton's review, the Committee retained those three funds, but removed a GSAM-managed real estate fund—not at issue here—in favor of a non-GSAM alternative.  *Id.* ¶ 72.

In December 2011, the Retirement Committee directed Rocaton to expand the prior year's report and evaluate all of the GSAM funds compared to their peer groups.  *Id.* ¶ 73.

---

[12] Falberg does not dispute that, with respect to the 2010 review, Defendants' referenced exhibit states that "[i]t seems that over 3- and 5-year periods, the GSAM funds have performed above median or [at] median," but only disagrees that the High Yield Fund's 63rd percentile rank should be deemed at or above median.  *See* Doc. 227 at ¶ 71.

Following this review, the Committee voted in January to remove two additional GSAM funds and replaced them with funds not managed by GSAM.  *Id.* ¶ 74.  While the Committee removed certain GSAM funds from the Plan, it chose to retain the five challenged funds based on their long-term performance.  *Id.* ¶¶ 72, 74.  And in 2012, all five challenged GSAM funds outperformed their benchmarks.  *Id.* ¶ 100.

According to Defendants' expert, the "long-run (ten-year) historical returns" of the Mid Cap Value Fund, Large Cap Value Fund, and High Yield Fund, as of January 1, 2014, "were generally consistent with, or better than, those of their mutual fund peers (both on an absolute and a risk adjusted basis)."  *Id.* ¶ 102.  Over that same ten-year period, before January 1, 2014, the Mid Cap Value Fund, High Yield Fund, and Large Cap Value Fund ranked in the top 28th, 47th, and 57th percentile, respectively, of their mutual fund peers.  *Id.* ¶ 103.  And during the first three years of the class period, both Morningstar and Lipper[13] also rated these three GSAM funds as average or above average.  *Id.* ¶ 111.  At the same time, Falberg's expert Fender argues that the three challenged funds "consistently and substantially underperformed benchmark indices and peer universe medians, both in terms of investment returns and risk adjusted returns," and argues this underperformance was "so obvious that a fiduciary would have to have consciously overlooked it to permit the funds to continue as an investment" in the Plan.  Doc. 228 ¶¶ 134, 138.[14]

---

[13] Morningstar and Lipper are financial services companies providing a range of investment research and investment management services.

[14] On this point, Defendants maintain Fender's opinion is based on a "flawed" consistency analysis and, in any event, they note he gives no deference to the Committee's decision-making process with respect to the three underperforming funds:  indeed, the Committee did evaluate these three funds shortly before the start of the class period, and evaluated their historical performance in comparison to other investment options in their peer groups as well as non-proprietary alternatives.  Doc. 228 ¶ 127.

These three funds began to exhibit underperformance over multiple quarters in 2016. At its quarterly meeting on September 29, 2016, the Committee discussed the Mid Cap and Large Cap Value Funds: Rocaton presented information about both and fielded questions from the Committee; that same meeting also included a presentation by the GSAM managers who managed those funds. *Id.* ¶¶ 118–20. The Committee asked the GSAM managers questions about the funds' investment performance and the team's current outlook. *Id.* ¶ 121. After the GSAM managers left the meeting, the Committee and Rocaton discussed the value funds, and the Committee asked Rocaton to analyze alternatives that may be available. *Id.* ¶ 122.

The Retirement Committee then scheduled an *ad hoc* meeting to further address the value funds; at this meeting, on October 25, 2016, Rocaton presented its view of the value funds and discussed potential alternatives.[15] *Id.* ¶¶ 123–24. The October 25, 2016, meeting minutes reflect that the Committee and Rocaton reviewed the investment lineup in the Plan, including the hedge fund asset class, the availability of passively managed investment options, and the GSAM-managed investment options. *Id.* ¶ 125.

The Committee asked Rocaton to prepare a presentation focusing on the Plan's investment lineup as a whole and decided to further review the status of the two value funds at its next quarterly meeting on December 5, 2016. *Id.* ¶ 126. At the December 5, 2016, meeting, Rocaton made a presentation to the Committee regarding the Plan's investment fund lineup and

---

[15] Falberg disagrees about the purpose of the meeting and argues it was set up to "address the litigation risk associated with all proprietary funds." *Id.* ¶ 123. But the September 29, 2016, minutes state that the "Committee asked Ms. Mintzer to set up an *ad hoc* meeting *for the Committee to further address the value funds.*" *Id.* (emphasis added). And the October 25, 2016, minutes state that "the primary purpose of this *ad hoc* meeting was to continue the discussion of the GSAM large cap and mid cap value funds . . . ." *Id.* In support of his contention that the meeting was arranged to address litigation risk, Falberg quotes from an email from Buehl to Mintzer stating that "it wasn't clear to me either whether the committee wanted an ad hoc meeting to discuss the GSAM value team or the broader GSAM strategies." *Id.* This email does not mention litigation risk and in any event does not rebut the fact that the Committee intended to—and did—discuss the value funds and alternatives at the October meeting.

discussed the GSAM actively managed investment options in the Plan. *Id.* ¶ 127. Rocaton's accompanying 119-page presentation, which was provided to Committee members in advance of the meeting, evaluated each of the five challenged GSAM funds in detail and compared those funds to potential replacements. *Id.* ¶ 128. Also at that meeting, the Committee listened to a presentation from the managers of a potential new investment. *Id.* ¶ 129.

Following these presentations, the Committee unanimously voted to remove five GSAM funds, including four of the funds challenged here: the Short Duration Government, Core Fixed Income, Mid Cap Value, and Large Cap Value Funds from the Plan, as well as the Strategic Income Fund. *Id.* ¶ 130. This vote was followed by discussion of the GSAM High Yield Fund and the Emerging Markets Equity Fund, and a request that the managers of possible alternatives to those funds present at the next Committee meeting. *Id.* ¶ 131.

The next Committee meeting, on April 3, 2017, contained similarly detailed presentations concerning the High Yield Fund and the Emerging Markets Equity Fund. *Id.* ¶ 132. Rocaton provided an overview of potential non-GSAM alternatives and compared both GSAM funds to those alternatives. *Id.* ¶ 133. Also at that meeting, the Committee listened to presentations by investment managers of alternative funds under consideration. *Id.* ¶ 134. Following those presentations, the Committee voted unanimously to remove the High Yield Fund and Emerging Markets Equity Fund from the Plan and to add non-GSAM funds as replacements. *Id.* ¶ 135. The High Yield Fund—the last of the five challenged GSAM mutual funds—was removed from the Plan on June 6, 2017.[16] *Id.* ¶ 136.

---

[16] Falberg argues the challenged funds ultimately were removed to avoid litigation risk. In support, he points to Mintzer's statement that she anticipated discussions at the October 2016 meeting regarding "legal's review of the recent wave of ERISA litigation," Doc. 228 ¶ 199, as well as her testimony that the Committee was "becoming concerned that there would be more scrutiny and false accusations regarding keeping Goldman funds on the platform," and that "it would be easier to just remove the proprietary funds from the menu to avoid any potential litigation like this." Doc. 228 ¶ 229.

Defendants explain there are transaction costs associated with making frequent changes to the menu of investment options in a defined-contribution plan. *Id.* ¶ 137. In particular, according to Defendants' expert Eileen Kamerick, "changes to a plan's investment lineup" should "be approached with care" because they are "disruptive to participants and may cause disengagement and confusion." *Id.* ¶ 138. In explaining why it chose to remove all seven GSAM funds from the Plan's investment lineup in 2017, including the five at issue here, Committee members indicated that the costs of frequent changes to the Plan's investment menu was one reason to remove all the GSAM mutual funds together, rather than only removing some of them. *Id.* ¶ 140. Specifically, Committee member Dean Backer testified that the Committee would "rather do more at once than less at once, as it would be less disruptive, less confusing, more efficient to our participants, as opposed to removing two funds here and maybe one fund there and maybe two funds there, whatever they may be." *Id.* ¶ 142.

### i. Rocaton Ratings of the Challenged Funds

Before and during the class period, three of the challenged funds, the Mid Cap Value Fund, Large Cap Value Fund, and High Yield Fund, were rated "not broadly recommended" by Rocaton. *Id.* ¶ 75. Moreover, none of the five challenged funds was rated "sell" by Rocaton during the relevant time period. *Id.* ¶ 79. Also during the class period, at least four non-GSAM funds included in the Plan's investment lineup were rated "not broadly recommended" by Rocaton, and on September 26, 2014, Rocaton downgraded its ratings of two non-GSAM investment options in the Plan to "sell." *Id.* ¶¶ 83–84. After receiving input from Rocaton and hearing a presentation from the investment managers of the "sell"-rated funds, the Committee voted on October 16, 2014 to retain and continue to monitor these investment options notwithstanding Rocaton's "sell" rating. *Id.* ¶ 85.

As set out above, Committee members testified that, in evaluating Plan investment options, they considered Rocaton's ratings alongside all the other information Rocaton provided. *Id.* ¶ 80. And Backer testified that Rocaton's ratings were considered as one of a number of factors.[17] *Id.* In particular, the Committee considered performance data, commentary from managers and from Rocaton, and the Committee members' own knowledge of capital markets and market indicators in evaluating Plan investment options. *Id.* ¶ 81. The Committee also considered the fees charged by GSAM as part of its review of Plan investment options. *Id.* ¶¶ 45–46. Rocaton provided the Committee with comparisons of the fees charged by each fund available to the Plan with those charged in its peer group.[18]

### ii. Alternative Investment Vehicles

Falberg objects that the Committee did not move the Plan assets invested in the GSAM mutual funds to lower-cost separately managed accounts. But this option was unavailable to the Committee, as the Plan could not pay GSAM management fees for separately managed accounts under ERISA's prohibited transaction rules. According to Mintzer, although the Committee generally preferred to choose investment vehicles that could "get the lowest fee for the participants," Doc. 228 ¶ 77, the Plan could make the challenged funds' strategies available to Plan participants through separately managed accounts only if GSAM was willing to forgo any

---

[17] Falberg again objects that Rocaton's ratings are the "final output after considering all information they deem relevant in evaluating a fund," but does not dispute that Committee members *also* considered the additional information.

[18] Falberg also notes the addition of two other GSAM funds—not at issue here—during the class period: the Emerging Markets Equity Fund and the Strategic Income Fund. Falberg argues the addition of these funds "demonstrates the preferential treatment afforded to proprietary funds," Doc. 198 at 12, and on in support of this claim, notes the Rocaton ratings for each: first, the Committee chose the Emerging Market Equities Fund over two "buy" rated non-proprietary options, despite the fact that Rocaton had not yet completed due diligence on it, and, second, the Committee chose the Strategic Income fund over other, non-proprietary "buy" rated funds despite the fact that it was rated "not broadly recommended." Doc. 228 ¶¶ 111–18; 120–22.

management fees paid by the plan.  Doc. 227 ¶ 88.  GSAM was not willing to do so and as a result, that option was unavailable to the Committee.  *Id.* ¶ 89.

### iii.  "Fee Rebates"

Falberg also objects that while other retirement plans received fee rebates, in the form of revenue sharing, from GSAM mutual funds, the Plan did not.  For example, GSAM made revenue-sharing payments to Hewitt Associates, which provided recordkeeping services to the Plan and many other retirement plans, pursuant to a shareholder services agreement between GSAM and Hewitt Associates.  *Id.* ¶ 93.  That agreement excluded the assets of all retirement plans that opened accounts with the GSAM Fund prior to April 1, 2009.  *Id.*  Because the Plan invested in GSAM mutual funds before April 1, 2009, Hewitt Associates, as the Plan's recordkeeper, was ineligible to receive any revenue-sharing payments from GSAM related to the Plan.  *Id.* ¶ 94.  And, any other retirement plan for which Hewitt acted as recordkeeper that invested in GSAM mutual funds before April 1, 2009, likewise was ineligible for revenue-sharing payments from GSAM.  *Id.* ¶ 95.

On these points, Falberg does not dispute that as a result of the agreement between GSAM and Hewitt, the Plan and other plans invested in GSAM mutual funds before April 1, 2009, were ineligible for revenue-sharing payments from GSAM.  Falberg only objects that the Committee "made no effort to renegotiate this provision with Hewitt or otherwise secure the revenue sharing that other plans received from the [c]hallenged GSAM Funds."  *Id.* ¶¶ 94–95.

### iv.  Lack of an Investor Policy Statement

Falberg objects that the Committee did not maintain a written Investment Policy Statement ("IPS").  An IPS is a document outlining the process for a plan's investment-related decision making, and can include a plan's goals and strategic vision for investment.  According

14

S.A.0014

to Falberg's expert Wagner, having an IPS is a "best practice" for large retirement plans, and a "significant majority of large retirement plans have adopted an IPS." *Id.* ¶¶ 147–48. At the same time, Wagner acknowledged that an "IPS is not strictly required under ERISA," and that "ERISA's duty of prudence doesn't mandate a best practice." *Id.* ¶ 147. And when asked what she meant by a "significant majority" of plans, Wagner testified, "I really don't know. I haven't done the survey." *Id.* ¶ 148. She also testified that she couldn't give a percentage, other than saying a "vast majority or a significant majority." *Id.*

Wagner further opined that the Department of Labor "encourages plan fiduciaries to establish an IPS for the plan, and has stated that the maintenance of an IPS is consistent with a plan sponsor's fiduciary obligations," but when asked whether the Department of Labor had ever taken the position that an IPS is a required document, she answered that it had not. *Id.* ¶ 144.

Wagner also noted that an IPS would have helped the Committee identify problems with specific investments, and argued the absence of an IPS resulted in a "fairly rudderless or *ad hoc* process" and "contributed to the lack of attention paid to the GSAM Funds and the lax performance standards applied to them." *Id.* ¶¶ 41–42. Wagner added that it "is difficult to see how the [] Committee could have properly reviewed the performance of each investment option . . . without having a set of procedures or criteria to provide a framework for uniform decision-making, such as an IPS would have provided." *Id.* ¶ 41.

But, as Defendants point out, that the Committee lacked an IPS does not mean it did not have in place robust policies for selecting and monitoring investment options. *See Supra* Section I(b)–(c).

When asked whether the use of an IPS is a "best practice" for 401(k) plans, Defendants' expert Kamerick testified that an IPS is "one of the indicia" of a well-run plan but noted that plan

fiduciaries "can and do implement consistent selection and monitoring processes without adopting an IPS," and that the Committee's selection and monitoring processes in this case were "robust, supported by objective quantitative and qualitative analysis, and consistent with practices of other defined contribution plan committees." *Id.* ¶ 38. Kamerick also noted that all seven fiduciary committees on which she has served have maintained an IPS. Doc. 228 ¶ 32.

Falberg's expert Fender also testified that "it is not consistent with the standards of care for an ERISA fiduciary not to have an investment policy statement," and noted that all his clients maintain an IPS. *Id.* ¶ 33. Fender also opined that "because the Plan lacked an IPS, the Committee's goals were unclear," and an IPS would have provided a "specific roadmap on how to achieve [the Plan's] goals and objectives." *Id.* ¶ 37.

Fender further noted that "if the Plan had an IPS that contained reasonable criteria for evaluating GSAM funds, then the [] High Yield Fund, Mid Cap Value Fund, and Large Cap Value Fund all would have been removed from the Plan by the beginning of 2014 at the latest." *Id.* ¶ 43. Still, Fender acknowledged that any opinion regarding whether the plan would have performed better had the Committee adopted an IPS "would be . . . hindsight or hypothetical." Doc. 227 ¶ 149.

And, Falberg explains that before the Committee hired Rocaton as its investment advisor, it considered other advisors, three of which recommended the development of an IPS in their submissions responding to the Plan's Request for Proposal ("RFP"); in particular, Falberg notes that in their submissions, Hewitt EnnisKupp listed "[d]evelop and follow an IPS" as one of its best practices, Callan Associates Inc. included a "detailed" IPS as one of its "best in class" characteristics, and Mercer ranked "develop an Investment Strategy" as its "Step 1." Doc. 228 ¶¶ 12, 27–30.

S.A.0016

In its response to the RFP, Rocaton did not explicitly note the importance of an IPS. *Id.* ¶ 31. Still, Falberg notes that Rocaton has published literature advising clients to maintain and regularly revisit an IPS. *Id.*

And when asked whether she "advise[d] other plans to use IPSs and update them," Buehl, one of Rocaton's co-founders, testified that "[o]ther clients have IPS documents and update them;" she could not recall whether there was a Rocaton client, other than the Plan, that did not have an IPS. *Id.* ¶ 31.

While the Committee did not have a written IPS, Committee secretary Mintzer testified that the Plan's "broadly stated" investment policy was "[t]o provide the highest quality of investment managers representing diversified strategies in both passively and actively managed forms for the benefit of 401(k) participants." *Id.* ¶ 72.

### d. Falberg's Claims

Falberg claims that Defendants breached their fiduciary duties under ERISA by (1) "only reluctantly and belatedly" removing underperforming GSAM funds as Plan investment options, (2) failing to consider lower-cost institutional investment vehicles, and (3) failing to claim "fee rebates" on behalf of the Plan that allegedly were available to other similarly situated retirement plans that invested in the GSAM funds. Doc. 1 ¶¶ 47, 65–71, 72–77. With respect to the retention and "belated" removal of the funds, Falberg's expert Fender noted that the Committee should have carefully scrutinized and removed the Mid Cap Value Fund, Large Cap Value Fund, and High Yield Fund from the Plan by January 1, 2014, if not earlier. *Id.* ¶ 104. In particular, Fender opined these three funds should have been removed because they consistently and substantially underperformed benchmark indices and peer universe medians, because they were not recommended by Rocaton, and because they were retained as higher-cost mutual funds

S.A.0017

instead of lower-cost investment vehicles.  Doc. 227 ¶ 104.  Fender also maintained the Committee should not "have been satisfied with an average investment product."  *Id.* ¶ 105.

In all, Falberg claims Defendants breached their duties of loyalty and prudence by "retaining high-cost, poorly performing mutual funds in the Plan" based on their "own self-interest" and in "disregard for participants."  Doc. 1 ¶ 47.  Falberg also alleges that the Committee's purported failure to claim fee rebates that supposedly were avail to other plans violated ERISA's prohibited transaction restrictions, and that Goldman Sachs breached its duty to monitor the Retirement Committee.

## II.     LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the burden of proof at trial would fall on the movant, that party's "own submissions in support of the motion must entitle it to judgment as a matter of law."  *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998).  Conversely, "[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex*

*Corp.*, 477 U.S. at 322–23). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp.*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)) (internal quotation marks omitted). However, in opposing a motion for summary judgment, the nonmoving party may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation mark omitted). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

The same legal standard applies when analyzing cross-motions for summary judgment. *See Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (quoting *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 828 (S.D.N.Y. 1996)). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)). The Court is

19

not required to grant summary judgment in favor of either moving party. *See id.* (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

## III. DISCUSSION

### a. Breach of the Duty of Prudence

The central purpose of ERISA is "to protect beneficiaries of employee benefit plans." *Slupinski v. First Unum Life Ins. Co.*, 554 F.3d 38, 47 (2d Cir. 2009). To further this purpose, ERISA imposes on fiduciaries a duty to "act in a prudent manner 'under the circumstances then prevailing.'" *Pension Benefit Guar. Corp. ex rel. St Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (quoting 29 U.S.C. § 1104(a)(1)(B)). This duty is measured "according to the objective prudent person standard developed in the common law of trusts" one that requires the fiduciary to act with "prudence, not prescience." *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 63–64 (2d Cir. 2016) (quotation marks omitted).

Under that standard, courts judge a fiduciary's actions "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight." *Pension Ben. Guar.*, 712 F.3d at 715–16. This inquiry "focus[es] on a fiduciary's conduct arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment." *Id.* (internal quotation marks and citations omitted). Put simply, the central question is whether a "prudent fiduciary in like circumstances would have acted differently." *Id.* at 720. So long as the "prudent person" standard is met, ERISA does not impose a "duty to take any particular course of action if another approach seems preferable." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (internal citation omitted).

20

Here, Falberg's claim that Defendants breached their duty of prudence rests on a single factor: the Committee did not adopt an IPS.[19] Falberg argues that a prudent fiduciary in Defendants' shoes would have "acted differently" by maintaining an IPS, and that, because the Committee did not have an IPS, it had no criteria by which to evaluate and monitor Plan investments, and therefore its decisions relating to the GSAM funds were not the result of a deliberative process.

Without such a process, Falberg argues, the Committee could not properly scrutinize the GSAM funds, and had it adopted an IPS, Falberg further argues, the Committee would not have retained the GSAM funds in more expensive investment vehicles, rather than cheaper, nonproprietary options; would not have failed to secure fee rebates from the funds; and would have removed the underperforming, poorly rated funds far earlier than it did.

But it is undisputed that an IPS is not required under ERISA. *See Taylor v. United Technologies Corp.*, 2009 WL 535779 (D. Conn. Mar. 3, 2009), *aff'd*, 354 App'x 525 (2d Cir. 2009), (plaintiff's expert faulted the plan sponsor "for failing to create a written Investment Policy Statement," but the court held that "ERISA does not require a fiduciary . . . to create such a document.") While Falberg argues an IPS is a "best practice," his expert Wagner conceded that the duty of prudence does not mandate a "best practice." Doc. 227 ¶ 147. And, despite Falberg's suggestions to the contrary, the Department of Labor has never taken the position that an IPS is required to satisfy a fiduciary's duties. *See id* ¶ 144.

Falberg makes much of the fact that a "significant majority" of large retirement plans have adopted an IPS and that investment advisors as well as the parties' experts have

---

[19] The section of Falberg's opposition to Defendants' motion devoted to the duty of prudence focuses *only* on Falberg's complaint that Defendants lacked an IPS. *See* Doc. 198 at 16–25.

recommended its use.  But this is beside the point:  that the adoption of an IPS is a common practice among retirement plans does not suggest that the choice to forgo one is a breach of any fiduciary duty under ERISA, and Falberg does not point to any authority showing otherwise.

Falberg does cite to *Liss v. Smith*, 991 F. Supp. 278 (S.D.N.Y. 1998) for the proposition that an "IPS was essential here in light of the conflicts of interest." Doc. 198 at 17 n.22.  The court in *Liss* recognized that "ERISA does not contain a specific requirement that a written investment policy be maintained by the trustees," *id.* at 296, and while it did find that the trustees breached their fiduciary duty, Defendants are right that the absence of a written policy alone was not dispositive and that it was just one factor "coupled with the other acts and omissions . . . [that] constituted a breach of fiduciary duty." *Id.*  In *Liss*, the officers of a union whose "financial condition" was "deteriorating" had "engaged in financial malpractice including embezzlement of Local Union Funds." *Id.* at 286.  The *Liss* court criticized the "trustees' complete and total failure to take even the most minimal and basic steps to ensure that Fund assets were invested and spent properly," and found that the 'list of omissions [was] a prototype for breached fiduciary duty." *Id.* at 288.  Here, there is no evidence of such total mismanagement.

Without an IPS guiding its review, Falberg argues, the Committee failed to undertake more fulsome, in-depth discussion of the challenged funds.  Falberg speculates—based on the number of investment options and the typical timetable for Committee meetings—that the Committee may have spent "less than a minute" discussing each investment option at its meetings. Doc. 198 at 18.  Falberg further notes that none of the challenged funds is mentioned in the meeting minutes for much of the class period, and objects that the minutes "contain no details" about Rocaton's ratings of the challenged funds:  what concerns led to those ratings, why

the funds were retained despite the ratings, whether the Committee or Rocaton would more closely monitor the funds going forward. *Id.* at 24.

Falberg then suggests that because the Committee had "no set criteria" to guide its review, the GSAM funds "were allowed to avoid scrutiny," even when some unperformed their benchmarks; when "cheaper, nonproprietary options" were available; and in spite of Rocaton's "poor" ratings. *Id.* at 19–23. At bottom, Falberg argues it "is unlikely the Committee could have justified retaining these funds," and that an IPS containing "any reasonable criteria for evaluating" the funds would have compelled it to remove them "by the beginning of 2014 at the latest." *Id.* at 25 (alterations omitted).

As support for his claim that the Committee lacked a "deliberative process" with respect to the challenged funds—a process he maintains an IPS would have ensured—Falberg focuses almost entirely on the minutes from Committee meetings. In particular, Falberg argues that the sparse, "boilerplate" meeting minutes reveal that the Committee at most engaged in a cursory review of the challenged funds, in effect ignoring them. Doc. 198 at 3, 18–25. At the outset, as Defendants correctly note, there is no requirement that meeting minutes need to be a verbatim transcript of all the issues considered by fiduciaries. Indeed, Falberg's expert Wagner previously has acknowledged that meeting "minutes do not need to be lengthy" and testified that "the documentary file doesn't have to be verbatim." Doc. 227 ¶ 51. Wagner further testified "more robust" minutes "are not an affirmative duty, per se." *Id.* Beyond this, as Defendants point out, Falberg fails to cite a single case that sustained a claim for breach of the duty of prudence on the ground that a committee's minutes were insufficiently descriptive.

In any event, Falberg does not point to any evidence that an IPS would have caused the Committee to act differently. Falberg does not dispute that in advance of Committee meetings,

23

S.A.0023

Committee members received a packet of information from Rocaton—including information about each of the Plan's investment options, monthly and quarterly performance reports, written reports summarizing Rocaton's meetings with investment managers, and Rocaton's commentary on different investment options and industry trends—and reviewed those materials in preparation for the meetings. Doc. 227 ¶¶ 43–47. Falberg also does not dispute that Rocaton began each quarterly meeting by presenting information about Plan performance and that Committee members often heard presentations from investment managers of current or prospective Plan investment options. *Id.* ¶¶ 50–53. That the meeting minutes do not reflect a particular level of detail with respect to these discussions—of the funds and their performance, as well as alternatives—does not mean the discussions did not happen, nor is it enough to suggest that the Committee's consideration of its investment options, both during and outside its regular meetings, was not sufficiently "deliberative" or was otherwise imprudent.

Falberg's claim that the Committee did not engage in a prudent process because it did not set out in writing an IPS is at best speculation and as such is unavailing. Indeed, as Falberg's expert Fender recognized, an opinion on whether an IPS might have improved Plan performance would be "hindsight or hypothetical." Doc. 227 ¶ 149. Because Falberg cannot show that a prudent fiduciary, in Defendants' position, would have acted differently, his breach of the duty of prudence claim fails.

### b. Breach of the Duty of Loyalty

ERISA's duty of loyalty requires fiduciaries to "discharge [their] duties with respect to a plan solely in the interest of the participants." 29 U.S.C. § 1104(a)(1)(A). "The Second Circuit has described [this] duty as one requiring a fiduciary to act . . . with an 'eye single to the interests of the participants.'" *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 114 (S.D.N.Y.

24

S.A.0024

2018) (quoting *State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 136 (2d Cir. 2003)), *aff'd sub nom. O'Day v. Chatila*, 774 F. App'x 708 (2d Cir. 2019).

Falberg raises four arguments in support of his claim that Defendants breached their duty of loyalty: (1) they failed to acknowledge their conflicts of interest, (2) they retained the challenged funds even though they were "outliers", (3) they gave preferential treatment to the challenged funds, and (4) they removed the funds only to protect themselves from litigation risk. In all, Falberg argues Defendants violated the duty of loyalty by "succumbing to their conflicts and maintaining a different standard for proprietary funds than for nonproprietary funds." None of these arguments is supported by evidence sufficient to defeat summary judgment.

### i. Conflicts of Interest

First, Falberg claims that Committee members faced an "inherent conflict of interest" as Goldman Sachs employees because GSAM received management fees from the Plan's investment in GSAM funds. Doc. 198 at 8. On this point, Falberg points to testimony from his expert Fender, who opined that "there is no serious question that it was a conflict of interest for the GSAM funds to be included in the Plan," and that "the real issue here is whether the Retirement Committee properly managed the conflict[.]" Doc. 228 ¶ 104. Falberg then argues that Defendants at once "disavow[ed] their conflict" and "greeted the conflict with open arms" but points to no evidence in support of either claim.

Falberg suggests only that Rocaton's presentation—and the Committee's selection—of "not broadly recommended" GSAM funds—when "buy" rated funds also were available—is evidence of a "more-lenient" standard for proprietary funds, and "exemplifies the Committee's . . . favoritism toward GSAM funds." Doc. 198 at 9. As the best summary of Defendants' conflict, Falberg quotes from Committee Co-Chair Gleberman who, when asked why Rocaton

presented funds it had rated "not broadly recommended" as options for inclusion in the plan, testified that "Rocaton would generally have to comment on whether GSAM had a fund that was available," and that it would be "sort of human nature" for Rocaton to "comment." Doc. 198 at 9. But Falberg does not explain how Rocaton's general inclination to "comment" on whether GSAM funds were available in any way demonstrates that Defendants greeted a conflict of interest with open arms or gave special treatment to the GSAM funds.

In any event, "in the ERISA context, 'a conflict of interest alone is not a per se breach'" of the duty of loyalty. *In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d 614, 649 (S.D.N.Y. 2012) (citation omitted). As this Court previously recognized, to state a claim for a breach of the duty of loyalty, a plaintiff must show that the defendant acted *for the purpose of* providing benefits to itself or someone else. *Falberg v. Goldman Sachs Group, Inc.*, 19 Civ. 9910 (ER), 2002 WL 3893285, at *13 (S.D.N.Y. Jul. 9 2020).

Here, Falberg does not dispute that Committee members received training on their fiduciary responsibilities, including the need to treat GSAM funds the same as non-GSAM funds. *See* Doc. 227 ¶¶ 20–21, 24, 26. Nor does he dispute that no Committee member had a personal financial incentive to prefer GSAM funds over nonproprietary options: indeed, his expert Wagner, when asked whether she was aware that any Committee member had a personal financial incentive in having the Plan offer investment options managed by GSAM, answered "No," and further testified that she had no reason to question the "honesty" or "integrity" of any Committee member. Doc. 227 ¶¶ 12, 13. Beyond this, as set out above, Committee members uniformly testified that they applied no different standard for GSAM funds than for any other fund, and that the evaluated each investment option on its merits. *See id.* ¶¶ 59–63.

At bottom, as Defendants note, the mere possibility that Committee members may have been influenced by a desire to benefit Goldman Sachs is not enough to show a breach of the duty of loyalty; Falberg has not pointed to any evidence demonstrating the Committee "acted for the purpose" of advancing Goldman Sachs' interests. As a result, his conflict of interest argument cannot support a claim of the breach of the duty of loyalty.

### ii. "Outlier" Funds

Second, Falberg argues the challenged funds were inferior to alternative investments available to the Plan in three ways: first, three of the GSAM funds were rated "not broadly recommended" by Rocaton; second, the majority of the mutual funds retained by the Plan were proprietary funds and were "higher-cost" than other investment options; and third, the challenged funds consistently underperformed their benchmarks, in "stark contrast" to the Plan's nonproprietary funds. Doc. 198 at 10–11. Defendants' retention of these funds, despite their purported inferiorities, Falberg argues, amounts to a breach of the duty of loyalty.

As to Rocaton's ratings, Falberg does not dispute that the Committee was presented with—and considered—a range of information beyond the ratings, and that these ratings were only a small part of the information Rocaton provided to the Committee. Doc. 227 ¶¶ 43, 44. Indeed, Falberg's expert Wagner testified that she did not imply or intend to imply that the ratings were the "end-all and sole output or product of Rocaton." *Id.* ¶ 43.

Falberg also does not dispute that a "not broadly recommended" rating is not an instruction to "sell." Doc. 198 at 10 n.8; *see also* Doc. 227 ¶¶ 35, 79. And, according to Rocaton's Buehl, many of Rocaton's clients held investments with "not broadly recommended" ratings in their retirement plans, and Rocaton believed it was entirely appropriate for retirement committees to make such funds available as investment options. Doc. 227 ¶¶ 36–37.

27

S.A.0027

As Defendants note, there is no support for Falberg's suggestion that the Committee ignored the ratings—the Committee discussed and asked questions about the ratings at Committee meetings.  Doc. 227 ¶ 25.  Nor is there support for Falberg's contention that the Committee's retention of GSAM funds rated "not broadly recommended" is evidence of more favorable treatment of those funds:  Falberg does not dispute that during the class period, at least four non-GSAM funds included in the Plan's investment lineup also were rated "not broadly recommended" by Rocaton, and he also does not dispute that the Committee maintained two-non GSAM options in the Plan after Rocaton downgraded its rating of them to "sell."  Doc. 227 ¶¶ 82–84.  In other words, there is no basis for the suggestion that the Committee, in considering Rocaton's ratings, held GSAM funds to a different standard.[20]

In any event, Falberg does not argue that the Committee was obligated to consider only Rocaton's ratings in making decisions on its investment options, nor does he point to any law showing that the retention of poorly rated funds evinces a breach of the duty of loyalty.

As to higher costs, Falberg argues that the majority of the mutual funds retained by the Plan were proprietary funds and that these mutual funds cost substantially more than collective investment trusts ("CITs") and separate accounts in the same asset class.  Falberg contends that Defendants' choice to retain higher-cost GSAM mutual funds constitutes a breach of the duty of loyalty and cites to *Span v. The Boeing Co.*, 125 F. Supp. 3d 848, 867 (S.D. Ill. 2014) for the proposition that summary judgment is inappropriate where Defendants "admitted that these separate accounts were superior investment vehicles."  *Spano*, however, is factually inapposite:

---

[20] Here, Falberg notes that while Defendants did not document their reasoning for retaining "not broadly recommended" GSAM funds, they *did* do so for nonproprietary funds that also were rated "not broadly recommend; according to Falberg, this difference in treatment is "more than suspicious."  *See* Doc. 198 at 10 n.8.  But on this point, Defendants make clear they had other reasons for documenting those nonproprietary funds, namely that one had been downgraded to a "sell" rating and the others involved firms that were subject to an SEC settlement or complaint.  *See* Doc. 226 at 11–12.

Mintzer's testimony that the Committee generally preferred to choose investment vehicles that could "get the lowest fee for the participants," Doc. 228 ¶ 77, does not amount to an admission that separate accounts were "superior" to the funds Defendants retained.[21]

And, last, as to performance, Falberg contends that three of the challenged funds—the Large Cap Fund, Mid Cap Fund, and High Yield Fund—trailed their benchmarks on three-year, five-year, and ten-years bases. Here, Falberg points to testimony from his expert, Fender, who argued this underperformance was "so obvious that a fiduciary would have to have consciously overlooked it to permit the funds to continue as an investment in the [Plan]." Doc. 228 ¶ 138. Defendants in turn argue Fender's opinion rests on flawed analysis, but, in any event, whether Fender is right is beside the point with respect to Defendants' duty of loyalty: Falberg does not point to any law showing that Defendants' consideration—and eventual removal—of the underperforming funds, including their analysis of the funds' long-run performance, amounts to a breach of the duty of loyalty. Instead, Falberg suggests that Defendants' delay in removing the underperforming funds was part of their larger project of affording different and more favorable treatment to GSAM funds, and that when the funds' underperformance is "viewed together" with their higher costs and with Defendants' purported conflicts of interests, there exist "too many coincidences." Doc. 198 at 12 (quoting *Tussey v. ABB, Inc.*, 850 F.3d 951, 957–58 (8th Cir. 2017)). Beyond this broad contention that Defendants' treatment of the GSAM funds overall

---

[21] For their part, Defendants argue that lower-cost separately managed accounts were unavailable to them, as the Plan could not pay GSAM management fees for separately managed accounts under ERISA's prohibited transactions restrictions. *See* Doc. 175 at 26–27. In other words, Defendants maintain that even if they had wanted to retain lower-cost separately managed accounts, they were prohibited from doing so. *See id.* (noting the funds' strategies only could be available to Plan participants through separately managed accounts if GSAM had been willing to forgo any management fees paid by the Plan, and GSAM was unwilling to do so).

creates an inference of favoritism, Falberg does not point to any authority showing a failure to expeditiously remove underperforming funds amounts to a breach of the duty of loyalty.

### iii. Addition of Two GSAM Funds

Third, Falberg argues the addition of two other GSAM funds during the class period—the Emerging Markets Equity Fund ("EME Fund") and the Strategic Income Fund, neither of which is a basis for Falberg's claims here—"demonstrates the preferential treatment afforded to proprietary funds." Doc. 198 at 12. With respect to these two funds, Falberg again zeroes in on the Rocaton ratings, noting that (1) the Committee chose the EME Fund over two "buy" rated non-proprietary options, despite the fact that Rocaton had not yet completed due diligence on the EME Fund and cautioned that it "seem[ed] like a fairly aggressive strategy," Doc. 228 ¶¶ 120–22, and that (2) the Committee chose the Strategic Income fund over other, non-proprietary "buy" rated funds despite the fact that it was rated "not broadly recommended." *Id.* ¶¶ 111–18. Falberg then argues that these "self-interested selections," when "taken together and viewed in context," "shed light on [Defendants] motivations" for retaining proprietary funds and that but for their conflicts of interest, the Committee would not have chosen to include either fund. Doc. 198 at 14.

But, that the Committee's selection of these two proprietary funds may "shed light" on its "motivations" for retaining the five challenged funds does not show that the Committee was disloyal in violation of ERISA. And, in any event, Falberg again cannot overcome the fact that in considering these funds, as it did when it considered the challenged funds, the Committee looked to and weighed a range of information beyond the Rocaton ratings and was not obligated simply to defer to Rocaton's ratings or its suggestions.

30

#### iv. Removal of GSAM Funds

Last, Falberg argues that the Committee breached its duty of loyalty when it ultimately chose to remove the challenged funds to avoid litigation risk. In support, Falberg points to Mintzer's testimony that the Committee was "becoming concerned that there would be more scrutiny and false accusations regarding keeping Goldman funds on the platform," and that "it would be easier to just remove the proprietary funds from the menu to avoid any potential litigation like this." Doc. 228 ¶ 229.

But Falberg does not and cannot show that the Committee's consideration of the litigation environment in choosing to remove the challenged funds in any way amounts to a breach of its duty of loyalty.

Because Falberg cannot point to any evidence showing a breach of the duty of loyalty, he cannot defeat summary judgment on those claims.

### c. Prohibited Transaction Claims

Falberg argues the Committee's failure to collect fee rebates, in the form of revenue sharing, on behalf of the Plan that supposedly were available to other plans invested in GSAM mutual funds resulted in a "prohibited transaction" under ERISA. Specifically, Falberg argues that the lack of rebates for the Plan "placed Plan participants in a less favorable position than other investors." Doc. 198 at 27.

Section 406 of ERISA, 29 U.S.C. § 1106, identifies several types of transactions that constitute *per se* violations. These prohibited-transactions rules supplement a fiduciary's duty of loyalty by "categorically barring certain transactions deemed likely to injury the pension plan." *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42.

31

S.A.0031

Defendants argue that they are exempt from any violations of § 1106 under the Department of Labor's Prohibited Transaction Exemption 77-3 ("PTE 77-3"). Under PTE 77-3, an exemption applies where "[a]ll other dealings" between the Plan and Goldman Sachs were "on a basis no less favorable to the [P]lan than such dealings [were] with other shareholders." 42 Fed. Reg. 18,734 (Apr. 8, 1977).

Here, Falberg argues the Plan was treated less favorably than other plans because the fiduciaries of other plans collected fee rebates on behalf of those plans while the Plan's fiduciaries did not. On this point, Defendants maintain that Falberg's claim is premised on GSAM's shareholders services agreement with Hewitt Associates, which provided recordkeeping services to retirement plans, including the Plan, and that this agreement excluded the assets of all retirement plans that opened accounts with the GSAM fund prior to April 1, 2009.

Falberg does not dispute that the Plan invested in GSAM mutual funds before April 1, 2009, and that as a result, Hewitt, as the Plan's recordkeeper, was ineligible to receive any revenue-sharing payments from GSAM related to the Plan.[22] Falberg also does not dispute that any other retirement plan for which Hewitt acted as recordkeeper and that invested in GSAM mutual funds before April 1, 2009, likewise was ineligible for revenue-sharing payments from GSAM. This, Defendants argue, makes plain that the Plan was treated no less favorably than similarly situated plans: it was treated the same as other plans that (1) had the same

---

[22] Specifically, Falberg does not dispute the factual statements that "GSAM made revenue-sharing payments to Hewitt Associates, which provided recordkeeping services to the Plan and many other retirement plans, pursuant to a shareholder-services agreement," and (2) the agreement between GSAM and Hewitt "'exclude[d] the assets' of all retirement plans that 'opened accounts with the [GSAM] Fund prior to April 1, 2009." *See* Doc. 227 ¶ 93. Falberg *only* takes issue with the fact that the Committee "made no effort to renegotiate this provision with Hewitt or otherwise secure the revenue sharing that other plans received from the [c]hallenged GSAM Funds." *Id.*

recordkeeper and (2) invested in GSAM funds before April 1, 2009.  In all those cases, the recordkeeper—Hewitt—was contractually ineligible for any revenue sharing.

On this point, Falberg argues that this is too narrow a reading of the exemption, and that it matters that other investors, namely those plans than *did not* use Hewitt as their recordkeeper and those plans that opened their accounts *after* April 1, 2009, received fee rebates that the Plan did not.  But here Falberg cannot show that any difference in treatment is traceable to some less favorable basis and not, instead, to the fact that these plans simply did not use the same recordkeeper or, if they did, did not open their accounts until after April 1, 2009.   In other words, Defendants are right that the Plan was treated no less favorably "than other comparably situated plans."  Doc. 226 (citing *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17 (1st Cir. 2018)).  Accordingly, Defendants are exempt, and Falberg's prohibited transactions claim fails.

### d.  Breach of Duty to Monitor

Falberg's claim that Goldman Sachs breached its duty to monitor Plan fiduciaries is predicated on his allegation that the Committee breached its fiduciary duties.  *See In re Citigroup ERISA Litig.*, 2009 WL 2762708, at *26 (S.D.N.Y. Aug. 31, 2009).  Because this claim is derivative of Falberg's other claims, it fails for the same reasons.  *See Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013) ("[Falberg] cannot maintain a claim for breach of the duty to monitor . . . absent an underlying breach of the duties imposed under ERISA[.]").  In any event, as Defendants argue, there is no evidence to support this claim:  Falberg does not suggest that the Committee members were unqualified or failed to perform their duties.

### e.  Loss and Loss Causation

Falberg separately brings a partial motion for summary judgment on the issues of loss and loss causation.  *See* Doc. 190.  Specifically, Falberg argues that there is no dispute that (1)

the Plan suffered losses as a result of Defendants' use of the challenged GSAM funds and (2) those losses were caused by Defendants' decision to maintain the funds in the Plan and the manner in which they were maintained. *Id.* at 1.

As the Second Circuit has held, questions of loss and loss causation arise only after "a breach of fiduciary duty has been established." *Donovan v. Bierwirth*, 754 F.2d 1049, 1055 (2d Cir. 1985). Because the Court finds that Defendants did not breach any of their fiduciary duties under ERISA, the Court does not reach questions of loss and loss causation. As such, Falberg's motion for partial summary judgment on these issues is DENIED.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED and Falberg's motion for partial summary judgment is DENIED. In addition, Falberg's motion to compel documents designated as privileged and Defendants' motions to strike expert opinions and to compel arbitration of certain class members are DENIED as moot. The Clerk of Court is respectfully directed to terminate the motions, Docs. 131, 170, 174, 188, 195, and 213, and to close the case. The Clerk of Court is further directed to restrict access to this Opinion to the "selected party" viewing level.

It is SO ORDERED.

Dated: September 14, 2022
      New York, New York

_____
Edgardo Ramos, U.S.D.J.

34

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
Leonid Falberg, as representative of a class of
similarly situated persons, and on behalf of the
Goldman Sachs 401(k) Plan,

Plaintiff,

     -against-                              19 **CIVIL** 9910 (ER)

# **JUDGMENT**

The Goldman Sachs Group, Inc., The Goldman Sachs
401(k) Plan Retirement Committee, and John Does 1-
20,

Defendants.

-----------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated September 14, 2022, Defendants' motion for

summary judgment is GRANTED and Falberg's motion for partial summary judgment is

DENIED. In addition, Falberg's motion to compel documents designated as privileged and

Defendants' motions to strike expert opinions and to compel arbitration of certain class members

are DENIED as moot; accordingly, the case is closed.

**Dated:** New York, New York

      September 15, 2022

**RUBY J. KRAJICK**

_____
**Clerk of Court**

**BY:**     K. Mango

_____
**Deputy Clerk**

**28 U.S.C. § 1331: Federal Question**

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**29 U.S.C. § 1132: Civil Enforcement (Excerpt)**

. . . .

(e)    Jurisdiction

    (1)    Except for actions under subsection (a)(1)(B) of this section, the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary, or any person referred to in section 1021(f)(1) of this title. State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) and (7) of subsection (a) of this section.

    (2)    Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found, and process may be served in any other district where a defendant resides or may be found. . . .

**28 U.S.C. § 1291: Final Decisions of District Courts**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## 29 U.S.C. § 1104: Fiduciary Duties (Excerpt)

(a)    Prudent man standard of care

    (1)    Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

        (A)    for the exclusive purpose of:

            (i)    providing benefits to participants and their beneficiaries; and

            (ii)    defraying reasonable expenses of administering the plan;

        (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

        (C)    by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

        (D)    in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III.

    (2)    In the case of an eligible individual account plan (as defined in section 1107(d)(3) of this title), the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or

qualifying employer securities (as defined in section 1107(d)(4) and (5) of this title). . . .

## 29 U.S.C. § 1106: Prohibited Transactions

(a)    Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1)    A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A)    sale or exchange, or leasing, of any property between the plan and a party in interest;

(B)    lending of money or other extension of credit between the plan and a party in interest;

(C)    furnishing of goods, services, or facilities between the plan and a party in interest;

(D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E)    acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

(2)    No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

(b)    Transactions between plan and fiduciary

A fiduciary with respect to a plan shall not—

(1)    deal with the assets of the plan in his own interest or for his own account,

(2)    in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

(c)    Transfer of real or personal property to plan by party in interest

A transfer of real or personal property by a party in interest to a plan shall be treated as a sale or exchange if the property is subject to a mortgage or similar lien which the plan assumes or if it is subject to a mortgage or similar lien which a party-in-interest placed on the property within the 10-year period ending on the date of the transfer.

## 29 U.S.C. § 1109: Liability for Breach of Fiduciary Duty

(a)   Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

(b)   No fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary.

## 29 U.S.C. § 1113: Statute of Limitations

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

    (1)    six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

    (2)    three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

## 29 C.F.R. § 2509.75-8: Questions and Answers Regarding Fiduciary Responsibilities (Excerpt)

The Department of Labor today issued questions and answers relating to certain aspects of fiduciary responsibility under the Act, thereby supplementing ERISA IB 75–5 (29 CFR 2555.75–5) which was issued on June 24, 1975, and published in the Federal Register on July 28, 1975 (40 FR 31598). . . .

FR–17 Q: What are the ongoing responsibilities of a fiduciary who has appointed trustees or other fiduciaries with respect to these appointments?

A: At reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan. No single procedure will be appropriate in all cases; the procedure adopted may vary in accordance with the nature of the plan and other facts and circumstances relevant to the choice of the procedure.

**42 Fed. Reg. 18,734 (Apr. 8, 1977):**
**Prohibited Transaction Exemption 77-3 (Excerpt)**

Class Emption Involving Mutual Fund In-House Plans Requested by the Investment Company Institute

. . . .

Effective for transactions occurring after December 31, 1974, the restrictions of sections 406 and 407(a) of the Act and the taxes imposed by section 4975 (a) and (b) of the Code, by reason of section 4975(c)(1) of the Code, shall not apply to the acquisition or sale of shares of an open-end investment company registered under the Investment Company Act of 1940 by an employee benefit plan covering only employees of such investment company, employees of the investment advisor or principal underwriter for such investment company, or employees of any affiliated person (as defined in section 2(a)(3) of the Investment Company Act of 1940) of such investment adviser or principal underwriter, provided that the following conditions are met (whether or not such investment company, investment adviser, principal underwriter or any affiliated person thereof is a fiduciary with respect to the plan):

    (a)    The plan does not pay any investment management, investment advisory or similar fee to such investment adviser, principal underwriter, or affiliated person. This condition does not preclude the payment of investment advisory fees by the investment company under the terms of its investment advisory agreement adopted in accordance with section 15 of the Investment Company Act of 1940.

    (b)    The plan does not pay a redemption fee in connection with the sale by the plan to the investment company of such shares unless (1) such redemption fee is paid only to the investment company, and (2) the existence of such redemption fee is disclosed in the investment company prospectus in effect both at the time of the acquisition of such shares and at the time of such sale.

(c)    In the case of transactions occurring more than 60 days after the granting of this exemption, the plan does not pay a sales commission in connection with such acquisition or sale.

(d)    All other dealings between the plan and the investment company, the investment advisor or principal underwriter for the investment company, or any affiliated person of such investment advisor or principal underwriter, are on a basis no less favorable to the plan than such dealings are with other shareholders of the investment company.

**DOL Advisory Op. No. 88-16A, 1988 WL 222716 (Dec. 19, 1988): Opinion regarding 29 § U.S.C. 1104(a)(1) (Excerpt)**

Re: Chrysler Corporation and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America

Identification Number: F-3674A

Dear Mr. Ridella:

This is in response to your letter of July 7, 1986, in which you request, on behalf of the Chrysler Corporation (Chrysler) and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), an advisory opinion under the fiduciary responsibility provisions of the Employee Retirement Income Security Act of 1974 (ERISA). Specifically, you request an opinion that a certain understanding contained in a Letter Agreement between Chrysler and the UAW with respect to Chrysler's Pension Fund (the Plan) does not violate the aforementioned provisions of ERISA. The Letter Agreement is substantially similar to one entered into in 1979 by Chrysler and the UAW. . . .

We have stated that, to act prudently, a plan fiduciary must consider, among other factors, the availability, riskiness, and potential return of alternative investments for his or her plan. Because the investments you propose to recommend for the Plan would, if implemented, cause the Plan to forego other investment opportunities, such investments would not be prudent if they provided a plan with less return, in comparison to risk, than comparable investments available to the plan, or if they involved a greater risk to the security of plan assets than other investments offering a similar return.

We have construed the requirements that a fiduciary act solely in the interest of, and for the exclusive purpose of providing benefits to, participants and beneficiaries as prohibiting a fiduciary from subordinating the interests of participants and beneficiaries in their retirement income to unrelated objectives. Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must

ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan. . . .

This letter constitutes an advisory opinion under ERISA Proc. 76-1. Accordingly, this letter is issued subject to the provisions of that procedure, including section 10 thereof, relating to the effect of advisory opinions.

Sincerely,

Robert J. Doyle
Director of Regulations and Interpretations

. . . .