# No. 22-2689

IN THE

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

LEONID FALBERG, AS REPRESENTATIVE OF A CLASS OF SIMILARLY SITUATED
PERSONS, AND ON BEHALF OF THE GOLDMAN SACHS 401(K) PLAN,

*Plaintiff-Appellant,*

— v. —

THE GOLDMAN SACHS GROUP, INC., THE GOLDMAN SACHS 401(K) PLAN
RETIREMENT COMMITTEE,

*Defendants-Appellees,*

JOHN DOES 1-20,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK,
NO. 19-CV-09910, HON. EDGARDO RAMOS

## BRIEF OF DEFENDANTS-APPELLEES

RICHARD C. PEPPERMAN II
THOMAS C. WHITE
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel states as follows:

1.    Defendant-Appellee The Goldman Sachs Group, Inc. has no corporate parent, and to the best of its knowledge, no publicly held corporation owns 10% or more of its stock.

2.    No other Defendant-Appellee is a corporate party.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

ISSUES PRESENTED.........................................................................................4

STATEMENT OF THE CASE .............................................................................5

      A.    Factual Background...............................................................................5

            1.    Goldman Sachs' 401(k) Plan ......................................................5

            2.    The Retirement Committee..........................................................6

            3.    The Committee's Management of the Plan ................................7

            4.    Rocaton's Manager Ratings .......................................................9

            5.    Fee Rebates ................................................................................10

            6.    The Pre-Class Period Scrutiny of GSAM Funds ......................11

            7.    The Challenged Funds' Performance .......................................12

            8.    The Removal of the Challenged Funds.....................................14

      B.    Procedural History...............................................................................16

      C.    The Decision on Appeal ......................................................................18

SUMMARY OF ARGUMENT .............................................................................21

ARGUMENT ......................................................................................................26

I.    The District Court Correctly Held That Plaintiff Failed to Present
    Sufficient Evidence of a Breach of the Duty of Loyalty ...............................26

      A.    The Committee Employed a Rigorous Process to Manage
           Conflicts of Interest.............................................................................27

      B.    The Committee Held GSAM Funds to the Same Standard as
           Other Plan Investments .......................................................................29

C. The Evidence Does Not Support Plaintiff's Claim of Favoritism Toward GSAM Funds .........................................................31

 1. The Committee carefully monitored the GSAM funds' performance .............................................................32

 2. Plaintiff's complaints about the GSAM funds' fees do not withstand scrutiny .............................................37

 3. Plaintiff's arguments about the Committee's selection criteria do not apply to the five challenged funds....................39

II. The District Court Correctly Held That Plaintiff Failed to Present Sufficient Evidence of a Breach of the Duty of Prudence ..........................42

 A. The Committee Employed a Prudent Process.....................................43

 B. The Committee Did Not Breach Its Duty of Prudence by Not Adopting an IPS ..........................................................46

 C. The Evidence Does Not Support Plaintiff's Criticisms of the Committee's Process ..........................................................49

III. The District Court Correctly Rejected Plaintiff's Prohibited-Transaction Claims .........................................................54

IV. The District Court Correctly Rejected Plaintiff's Duty-to-Monitor Claim.........................................................................60

CONCLUSION .....................................................................61

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alas* v. *AT&T Servs., Inc.*,
2021 WL 4893372 (C.D. Cal. 2021) ................................................................26

*Anderson Grp., LLC* v. *City of Saratoga Springs*,
805 F.3d 34 (2d Cir. 2015) ...........................................................................50

*Anderson* v. *Liberty Lobby, Inc.*,
477 U.S. 242 (1986).......................................................................................21

*Baird* v. *BlackRock Institutional Trust Co.*,
403 F. Supp. 3d 765 (N.D. Cal. 2019) ........................................................31

*Birse* v. *CenturyLink, Inc.*,
2020 WL 1062902 (D. Colo. 2020)...............................................................26

*Brotherston* v. *Putnam Invs., LLC*,
2017 WL 1196648 (D. Mass. 2017) ..............................................................54

*Brotherston* v. *Putnam Invs., LLC*,
907 F.3d 17 (1st Cir. 2018)......................................................................57, 58

*Cryer* v. *Franklin Resources, Inc.*,
2018 WL 6267856 (N.D. Cal. 2018) ............................................................59

*Cunningham* v. *Cornell Univ.*,
2017 WL 4358769 (S.D.N.Y. 2017)..............................................................57

*Cunningham* v. *USI Ins. Servs. LLC*,
2022 WL 889164 (S.D.N.Y. 2022)...............................................................51

*DiFelice* v. *U.S. Airways, Inc.*,
497 F.3d 410 (4th Cir. 2007) ........................................................................45

*Ferguson* v. *Ruane Cunniff & Goldfarb Inc.*,
2019 WL 4466714 (S.D.N.Y. 2019)..............................................................27

*Fuller* v. *SunTrust Banks, Inc.*,
2019 WL 5448206 (N.D. Ga. 2019) ........................................................30, 31

*Garthwait* v. *Eversource Energy Co.*,
    2022 WL 3019633 (D. Conn. 2022) ............................................................36, 48

*Gonzalez* v. *Northwell Health, Inc.*,
    2022 WL 4639673 (E.D.N.Y. 2022) ....................................................................54

*Harris Tr. & Sav. Bank* v. *Salomon Smith Barney Inc.*,
    530 U.S. 238 (2000)............................................................................................55

*Hughes* v. *Northwestern Univ.*,
    142 S. Ct. 737 (2022)..........................................................................................42

*Liss* v. *Smith*,
    991 F. Supp. 278 (S.D.N.Y. 1998) ....................................................................47

*McCabe* v. *Capital Mercury Apparel*,
    752 F. Supp. 2d 396 (S.D.N.Y. 2010) ...............................................................26

*Moitoso* v. *FMR LLC*,
    451 F. Supp. 3d 189 (D. Mass. 2020)....................................................27, 38, 51

*Moreno* v. *Deutsche Bank Ams. Holding Corp.*,
    2018 WL 2727880 (S.D.N.Y. 2018)....................................................................59

*Patterson* v. *Morgan Stanley*,
    2019 WL 4934834 (S.D.N.Y. 2019).............................................26, 37, 38, 54

*Pension Ben. Guar. Corp.* v. *Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) .......................................................................42, 46

*Rinehart* v. *Lehman Bros. Holdings Inc.*,
    817 F.3d 56 (2d Cir. 2016) .................................................................................60

*Sacerdote* v. *New York Univ.*,
    9 F.4th 95 (2d Cir. 2021) ...................................................................................24

*Smith* v. *CommonSpirit Health*,
    37 F.4th 1160 (6th Cir. 2022) ..............................................................32, 42, 43

*In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*,
    842 F. Supp. 2d 614 (S.D.N.Y. 2012) ...............................................................26

*Taylor* v. *United Techs. Corp.*,
    2009 WL 535779 (D. Conn. 2009) .......................................46

*Tibble* v. *Edison Int'l*,
    575 U.S. 523 (2015) ...........................................................43

*Varity Corp.* v. *Howe*,
    516 U.S. 489 (1996) ...........................................................26

*Vellali* v. *Yale Univ.*,
    2022 WL 13684612 (D. Conn. 2022) ................................48

*Weinstock* v. *Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000) ...............................................21

*White* v. *Martin*,
    286 F. Supp. 2d 1029 (D. Minn. 2003) .............................47

## Statutes

29 U.S.C. § 1104(a)(1) ............................................................26

29 U.S.C. § 1104(a)(1)(D) ......................................................51

29 U.S.C. § 1106 ....................................................................54

29 U.S.C. § 1113(1) ...............................................................17

## Other Authorities

29 C.F.R. § 2550.408b-2(f) .....................................................51

42 Fed. Reg. 18,734 (Apr. 8, 1977) ...................................37, 55

## INTRODUCTION

Plaintiff contends that Defendants breached their fiduciary duties under ERISA in managing the Goldman Sachs 401(k) Plan ("Plan") by supposedly giving preferential treatment to five mutual funds managed by Goldman Sachs Asset Management ("GSAM")—the Large Cap Value, Mid Cap Value, High Yield, Core Fixed Income, and Short-Duration Government Funds. Those funds were included among the more than 30 investment options offered by the Plan. According to Plaintiff's complaint—and as appropriately assumed by the district court at the motion-to-dismiss phase—Defendants retained those five GSAM funds in the Plan, notwithstanding their underperformance, to stem the supposed depletion of those funds' assets caused by other investors' large redemptions. Extensive discovery, however, revealed no basis for those allegations, and Plaintiff no longer mentions them. Instead, Plaintiff largely second guesses the decision-making of experienced, well-informed, and attentive Plan fiduciaries about the timing of the removal of the five GSAM funds from the Plan more than two years before this action was filed, arguing that the funds should have been removed sooner.

In granting summary judgment, the district court carefully examined the evidence developed during discovery and concluded in a thorough 34-page opinion that Plaintiff failed to present sufficient evidence to create a genuine issue for trial. In a case to be tried to the court, not a jury, the district court determined based on its

review of the exhibits, testimony, and expert reports submitted by the parties that it could resolve Plaintiff's claims as a matter of law without the need to hear live witness testimony and thus granted summary judgment.

On appeal, Plaintiff does not point to any evidence that the district court failed to consider or identify any disputed issues of material fact warranting a trial. Indeed, Plaintiff devotes precious little of his brief to attempting to articulate any purported errors by the district court or any disputed factual issues. Rather, he simply expresses his disagreement with the district court's decision and repeats the same broad contentions that the district court rejected as unsupported by the evidence. The district court's decision should be affirmed.

*First*, the court correctly found there is no triable issue on Plaintiff's claim that Defendants breached their duty of loyalty by retaining the GSAM mutual funds among the Plan's many investment options. The evidence shows that Defendants employed a robust process to manage any potential conflict of interest arising from including GSAM funds as Plan investment options. Members of the Retirement Committee ("Committee") received extensive training on conflicts, were advised by experienced ERISA counsel, and retained an independent investment advisor (Rocaton Investment Advisors LLC) to assist them in evaluating and monitoring all Plan investment options. Committee members uniformly testified that they held GSAM funds to the same standard as other Plan investments. Consistent with that

testimony, the Committee *removed* a total of ten GSAM funds from the Plan both before and during the class period. There is no evidence from which a reasonable factfinder could conclude that the Committee acted disloyally, and Plaintiff identifies no material facts in dispute on this claim.

*Second*, the court correctly held there is no triable issue on Plaintiff's claim that Defendants breached their duty of prudence by failing to monitor the GSAM funds. The evidence shows that the Committee employed a rigorous process to monitor all Plan investments, including the GSAM funds. The Committee's independent advisor, Rocaton, provided detailed monthly and quarterly reports on all Plan investment options. Each of the Committee's regular quarterly meetings began with Rocaton's leading a discussion of those options, and managers of Plan investments frequently made presentations to the Committee. Plaintiff nonetheless contends that this deliberative process was imprudent because the Committee did not adopt an Investment Policy Statement ("IPS") or some other "formal" criteria for monitoring investments. Yet no court has ever held that ERISA requires such formal criteria. Nor has the Department of Labor. Contrary to Plaintiff's accusation, the absence of an IPS did not lead "to a rudderless process" (Br. 32), and Plaintiff again identifies no material facts in dispute on his duty-of-prudence claim.

*Third*, the court correctly concluded there is no triable issue on Plaintiff's claim that Defendants violated ERISA's prohibited-transaction rules by not

collecting "fee rebates" from GSAM that supposedly were available. As Plaintiff concedes, the Plan was *ineligible* for fee rebates from GSAM under GSAM's agreement with the Plan's recordkeeper because the Plan invested in GSAM funds before April 1, 2009. Under the same agreement, *all* other retirement plans that invested in GSAM funds before that date likewise were ineligible for fee rebates from GSAM. The Plan thus falls within an exception to ERISA's prohibited-transaction rules: the Plan's dealings with GSAM were "on a basis no less favorable" to the Plan than GSAM's dealings with other similarly situated plans.

*Fourth*, the court correctly determined that there is no triable issue on Plaintiff's duty-to-monitor claim because that claim is derivative of Plaintiff's other claims and also unsupported by the evidence.

## ISSUES PRESENTED

1. Did the district court correctly hold that Plaintiff presented insufficient evidence that Defendants breached their duty of loyalty by putting Goldman Sachs' interest ahead of Plan participants' interests?

2. Did the district court correctly hold that Plaintiff presented insufficient evidence that Defendants breached their duty of prudence by not adopting an IPS or other "formal" criteria for monitoring Plan investments?

3. Did the district court correctly hold that Defendants satisfied the requirement of Prohibited Transaction Exemption ("PTE") 77-3(d) by offering

GSAM funds in the Plan "on a basis no less favorable" to the Plan than those funds were offered to other similarly situated plans?

4.     Did the district court correctly hold that Plaintiff's duty-to-monitor claim fails because it is derivative of Plaintiff's other claims and unsupported by the evidence?

## STATEMENT OF THE CASE

### A.     Factual Background

#### 1.     Goldman Sachs' 401(k) Plan

The Goldman Sachs Group, Inc. sponsors a defined-contribution plan for eligible employees who are responsible for directing the investments in their own accounts.  SA2.  The Plan gives participants a range of investment options.  During the class period, participants could choose among various "target date" funds or follow a "self-directed" approach that allowed them to select from more than 30 different investment options spanning a range of asset classes, management styles (passive versus active), and risk/return characteristics.  SA2; JA157-228.

Although Plaintiff complains that the five challenged GSAM funds were mutual funds (Br. 6), the Plan offered participants a choice of different investment vehicles, and the GSAM funds were not the only mutual funds offered by the Plan. As of July 31, 2013, the Plan's investment menu included twelve mutual funds, fifteen "separate accounts" (customized portfolios managed by an investment firm), and seven collective investment trusts ("CITs").  SA2 n.2.  Plaintiff concedes that

GSAM did not offer the five challenged funds' strategies as CITs to any investors. Br. 9 n.1. The Plan could not offer the five challenged funds as "separate accounts" because ERISA's prohibited-transaction rules precluded the Plan from paying GSAM a fee to manage separate accounts and GSAM was unwilling to forgo its management fee. SA13-14; JA145; JA555.

### 2. The Retirement Committee

The Committee is the named fiduciary responsible for selecting and monitoring Plan investments. SA3. During the class period, the Committee consisted of ten to twelve highly sophisticated financial professionals from Goldman Sachs. SA3. Plaintiff's expert described the Committee's members as "consummate financial professionals" with "deep expertise in the markets," some of whom are "famous" in the investment community. SA3; JA1756. Plaintiff's expert also acknowledged that the Committee members' experience "compares favorably" to that of members of other large-plan retirement committees, the "vast majority" of whom possess "limited investment knowledge." SA3; JA1756.

The Committee was assisted by a full-time secretary, Cheryl Mintzer, whom the district court described as "highly-qualified." SA3. Ms. Mintzer holds an MBA from Columbia Business School and is a Chartered Financial Analyst with extensive experience evaluating and managing investments. JA1263. The Committee also was advised by Goldman Sachs' ERISA counsel, Alan Wilmit, whom the district

court described as "experienced" and "highly-qualified," as well as ERISA counsel from Steptoe & Johnson LLP.  SA4; JA1135; JA1142.

Each new Committee member participated in one-on-one training with Goldman Sachs' ERISA counsel that covered members' fiduciary responsibilities, ERISA's prohibited-transaction rules, and potential conflicts of interest.  SA4; JA518; JA541; JA547.  Throughout their tenure, Committee members also received additional training at Committee meetings.  SA4; JA1265-66.  As the district court noted, Committee members were specifically trained to treat the GSAM funds offered by the Plan "exactly the same, as equals [to the other] plan options."  SA4 (alterations in original); JA518.

### 3.    The Committee's Management of the Plan

The Committee hired Rocaton as a fiduciary to provide impartial investment advice.  SA4.  "Rocaton provided the Committee with, among other things, (1) information about each of the Plan's investment options, including monthly and quarterly performance reports, (2) written reports summarizing Rocaton's meetings with investment managers, (3) Rocaton's commentary on different investment options and industry trends, and (4) other information periodically requested by the Committee."  SA4; JA429-30.

The Committee met at least once per quarter to review the Plan's investments and held *ad hoc* meetings as needed (eight during the class period).  SA6; JA519-

20; JA1308. Rocaton attended every Committee meeting, providing Committee members in advance of all quarterly meetings with detailed reports that included a quantitative and qualitative review of each investment option. SA6; JA150; JA1269-70. Those reports gave the Committee information about each option's quarterly, year-to-date, one-year, three-year, five-year, seven-year, and ten-year performance compared to index benchmarks and peers. SA6; JA1269. Committee members testified that they reviewed Rocaton's reports before each meeting, with some reading them "multiple times." JA3791; JA3811-12; *see also* JA1308-09.

Each quarterly meeting began with Rocaton presenting detailed information to the Committee about Plan performance and fielding questions from Committee members. JA1096-1154. The Committee also heard presentations from managers of current or prospective Plan investments. SA6-7; JA1291-92. As Plaintiff's expert admitted, the Committee's direct access to these outside investment managers was "very, very atypical" for a retirement committee and "a very good thing." JA1760-61. Rocaton also regularly met with investment managers and provided the Committee with reports on those meetings. JA149.

The Committee regularly evaluated the fees charged by each Plan investment option to ensure that the fees were reasonable and to reduce them whenever possible. SA6; SA13-14; JA2483. Committee members received detailed analyses of the fees charged by each investment option, including comparisons to peer-group averages

across different investment vehicle types. SA6; JA153; JA931-36; JA957-62. During the class period, the fees charged by the five challenged GSAM mutual funds were *lower* than the institutional mutual fund average. JA932; JA958.

### 4. Rocaton's Manager Ratings

Plaintiff relies heavily on Rocaton's manager ratings for three of the five challenged GSAM funds. Br. 11-12. As the district court noted, Rocaton provided the Committee with Rocaton's manager ratings for current and prospective Plan investments. SA5. Rocaton did not develop those ratings specifically for the Plan, but rather, as a full-service investment advisor, made them available to all of its clients. SA5; JA151; JA427.

During the class period, Rocaton assigned one of five ratings to funds: (i) Buy, (ii) Hold, (iii) Not Broadly Recommended, (iv) Sell, and (v) Under Consideration. SA5; JA1273. A "Not Broadly Recommended" rating meant that the fund was "not typically included by Rocaton in searches for new mandates, but may be suitable for some clients based on their specific objectives." JA942. Anne Buehl of Rocaton stressed that this rating was *not* a recommendation by Rocaton to sell the investment—Rocaton had a "Sell" rating for that purpose. SA5; JA151-52. Accordingly, "[m]any of Rocaton's clients held investments that Rocaton had rated 'Not Broadly Recommended,'" and "Rocaton believed it was appropriate for clients to invest in funds that had received [that] rating." JA151.

-9-

Anne Buehl further emphasized that Rocaton's "manager ratings were only a small part of the information … provided to the Committee about the Plan's investment options." JA150. Committee members likewise stressed that Rocaton's manager ratings were just "one of a number" of factors they considered in evaluating Plan investments and that the importance they assigned to those ratings varied depending on the circumstances. JA522; JA542. Ms. Buehl testified that she "recall[ed] receiving questions from the Committee" about Rocaton's manager ratings "and discussing [them] at Committee meetings." JA151.

### 5. Fee Rebates

Plaintiff asserts that "the Committee failed to secure fee rebates that were readily available to the Plan." Br. 9. As the Committee's investment advisor, Rocaton identified opportunities for the Plan to capture "fee rebates" or "revenue sharing." JA146. Investment managers sometimes pay fee rebates to a plan's service provider (such as a recordkeeper) based on plan assets held in eligible investments. JA504-05. These payments can be used to offset the service provider's fees or can be passed on directly to the plan. JA66. Under GSAM's contract with Hewitt Associates LLC—the recordkeeper for the Plan and many other retirement plans—Hewitt was *not* eligible to collect fee rebates from GSAM on behalf "of Customers who have opened accounts with [GSAM] Funds prior to April 1, 2009." JA508. Hewitt thus did not receive any fee rebates "from GSAM in connection with

-10-

the Plan's investments in [GSAM funds] because the Plan held investments in GSAM funds before April 1, 2009." JA502; SA14.

### 6. The Pre-Class Period Scrutiny of GSAM Funds

As the district court observed, Committee members uniformly testified that they applied "no different standard for Goldman Sachs funds than for any other fund in the plan." SA26. Committee Co-Chair Jeffrey Goldenberg testified that the Committee did not "treat[] proprietary funds any differently" and that it applied the "same format of evaluation" to all investment options. JA541. Co-Chair Paula Madoff similarly explained that the Committee "evaluated each investment [option] on its merits." JA548. And Committee member Dean Backer stressed that "[w]e would look at all of the options" applying the "same" criteria. JA521. Goldman Sachs' ERISA counsel confirmed that the Committee was "very careful to treat [GSAM funds] the same as they treat third parties." JA554.

The record belies Plaintiff's contention that GSAM funds escaped scrutiny by the Committee. Br. 16-17. In November 2010—three years before the start of the class period—the Committee asked Rocaton to evaluate the performance of five GSAM funds, including three of the funds challenged here (the Mid Cap Value, High Yield, and Short-Duration Government Funds), by comparing their performance to that of their peer group and funds on Rocaton's "Buy" list. SA8; JA1037-63; JA1284-85. That review showed that the three challenged GSAM funds performed

at or above the median performance of their comparators over three-year and five-year periods.  SA8; JA1037; JA1285.

Following Rocaton's review, the Committee voted in December 2011 to remove an underperforming GSAM real estate fund from the Plan and replace it with a non-GSAM fund, but to retain the three challenged funds.  SA8; JA1034-35; JA1285.  The Committee also directed Rocaton to expand its prior analysis and evaluate "ALL [of] the GSAM funds in the Plan against their peer groups."  SA8-9; JA1065-90; JA1285-86.  After this broader review, the Committee voted in January 2012 to remove two additional underperforming GSAM funds from the Plan (the Large Cap Growth and Mid Cap Growth Funds) and replace them with non-GSAM alternatives.  SA9; JA1031-32; JA1285-86.  The Committee's "decision to remove these three GSAM funds in 2011 and 2012" contradicts Plaintiff's claim of "preferential treatment" of GSAM funds.  JA1286.

### 7.    The Challenged Funds' Performance

The five challenged funds performed well after Rocaton's December 2011 review of all GSAM funds in the Plan.  Rocaton's quarterly reports to the Committee show that each of the five challenged GSAM funds outperformed its benchmark in 2012—the last full year before the start of the class period.  JA1814-18; *see* JA837; JA841; JA846; JA850; JA859.  Moreover, as of January 2014, the "long-run (ten-year) historical returns" of the Mid Cap Value, Large Cap Value, and High Yield

Funds—the three GSAM funds that Plaintiff says should have been removed from the Plan at the beginning of 2014, instead of in 2016-2017, because of their performance—"were generally consistent with, or better than, those of their mutual fund peers (both on an absolute and a risk-adjusted basis)." JA1448.

This level of performance continued well into the class period. At the Committee's request, Rocaton prepared monthly reports designed to "flag[] underperformers and outperformers" by comparing each investment's rolling twelve-month returns to those of its benchmark and identifying any fund whose performance deviated from its benchmark by one or two standard deviations. JA614; *see* JA560-65. These monthly reports show that none of the challenged GSAM funds underperformed its benchmark on a rolling twelve-month basis for three consecutive months (a full quarter) until December 2015, when the Mid Cap Value Fund showed one standard deviation of underperformance for a quarter, which rose to two standard deviations in March 2016. JA1812. The Large Cap Value and High Yield Funds did not show one standard deviation of underperformance on a rolling twelve-month basis for a quarter until March 2016 and May 2016, respectively. JA1812. During the class period, the other two challenged GSAM funds never exhibited one standard deviation of underperformance for a full quarter. JA1812. Consistent with these monthly reports, Morningstar and Lipper, two investment research firms, both rated the five challenged GSAM funds as average

-13-

or above average from 2013 to 2015, further rebutting any claim of underperformance.  SA9; JA1476; JA1486; JA1493; JA1497-98; JA1503.

### 8.    The Removal of the Challenged Funds

In response to Rocaton's monthly reports showing that three of the five challenged funds had exhibited some underperformance for over a quarter beginning in 2016, the Committee acted later that same year.[1]  At its September 29, 2016 quarterly meeting, the Committee discussed the performance of GSAM's Mid Cap Value and Large Cap Value Funds.  SA10; JA571-73.  The Committee received a presentation from those two funds' managers and asked questions about the funds' "investment performance," "the team's current outlook," and "adjustments made to the portfolios and investment theses."  JA572.  After the managers departed, the "Committee and Rocaton engaged in discussion regarding the value funds."  JA572. The Committee asked questions about available alternatives and requested that the Committee Secretary "set up an *ad hoc* meeting … to further address the value funds."  JA572.

At the *ad hoc* meeting on October 25, 2016, the Committee and Rocaton reviewed the Plan's overall investment lineup, including all of the GSAM funds.

---

[1] At the Committee's request, Rocaton prepared a "High Yield Mutual Fund Review" in December 2015.  JA947-55.  Although the Committee planned to invite the managers of the High Yield Fund to a Committee meeting in the first half of 2016 (JA944), the Committee deferred its review of the High Yield Fund until the second half of that year because of concerns about two non-GSAM options that required the Committee's immediate attention (JA1315-16).

SA10; JA578.  Rocaton presented "its views of the value funds including their performance and teams" and "discussed potential alternatives."  JA578.  The Committee asked Rocaton "to prepare a presentation focusing on" the Plan's investment lineup as a whole and "decided to further review" the value funds at its next quarterly meeting on December 5, 2016.  JA578-79.

Before that meeting, Rocaton provided the Committee with a 119-page presentation that included an evaluation of each of the five challenged GSAM funds as well as potential replacements.  SA10-11; JA635-751.  At the December 5 meeting, Rocaton discussed with the Committee the "Plan's investment fund lineup," including "the GSAM actively managed investment options."  JA575-76.  Following a presentation from managers of a potential alternative investment, the Committee unanimously voted to remove from the Plan four of the five challenged GSAM funds (the Mid Cap Value, Large Cap Value, Core Fixed Income, and Short-Duration Government Funds).  SA11; JA575-76.  After a discussion of the fifth challenged fund (the High Yield Fund), the Committee requested that managers of alternative high-yield investments attend its next meeting.  SA11; JA576.

At that next meeting on April 3, 2017, the Committee heard presentations from managers of two alternative high-yield funds and voted unanimously to remove GSAM's High Yield Fund from the Plan.  SA11; JA584-85; JA781-828.  The last

-15-

of the five challenged GSAM funds was removed from the Plan on June 6, 2017, more than two years *before* this action was filed. SA11.[2]

### B. Procedural History

Plaintiff filed this action on October 25, 2019. JA4529. The complaint alleged that Defendants breached their fiduciary duties of loyalty and prudence by failing to monitor (and remove from the Plan sooner) the five challenged GSAM funds. JA30-32 (¶¶88-95). These claims were predicated in part on an allegation that found no evidentiary support in discovery and thus is mentioned nowhere in Plaintiff's summary-judgment papers or appeal brief—namely, that the GSAM funds had experienced "large redemptions from other investors" in the years before the class period and that "Defendants retained these funds in the Plan … to stem the consequences of further depletion of fund assets." JA3 (¶7); *see also* JA20-22 (¶¶60-63). The complaint also asserted claims for prohibited transactions based on the Plan's failure to collect fee rebates that supposedly were available from GSAM and a claim for failure to monitor Plan fiduciaries. JA32-35 (¶¶96-111).

Plaintiff sought to represent a class of Plan participants who invested in GSAM mutual funds after October 25, 2013. JA27 (¶80). Plaintiff selected that start date (exactly six years before this case was filed) because of ERISA's six-year

---

[2] The Committee also voted to remove two other GSAM funds (the Strategic Income and Emerging Markets Equity Funds) from the Plan at its meetings on December 5, 2016 and April 3, 2017. JA576; JA585. As the district court held, those two funds "are not at issue" in this case. SA2 n.3.

statute of repose, 29 U.S.C. § 1113(1), not because of any allegation about Defendants' conduct or about any change in the GSAM funds' performance or fees.

Accepting the complaint's allegations as true, the district court denied Defendants' motion to dismiss. JA63-94. The court expressly relied on Plaintiff's allegation (abandoned after discovery) that "Defendants were incentivized to offer the GS Funds in the Plan" because those funds were enduring "significant redemptions" by other investors. JA68. At multiple places in its opinion, the court referenced Plaintiff's allegation that "the Plan represented increasingly significant percentages of the GS Funds as other investors increasingly dumped their shares." JA83. The court concluded that the complaint's allegation that "other investors" were redeeming "their shares in the GS Funds" suggested that "Defendants maintained the GS Funds not for the benefit of the Plan but for the benefit of" Goldman Sachs. JA86.

Again accepting the complaint's allegations as true, the district court also granted Plaintiff's motion for class certification. JA96-122. The court stated that it "must accept the allegations in the complaint as true" and cannot "assess any aspect of the merits unrelated to a Rule 23 requirement." JA103 (quotation omitted). The court limited the class to Plan participants who invested in one of the five GSAM funds challenged in the complaint (the Large Cap Value, Mid Cap Value, High

Yield, Core Fixed Income, and Short-Duration Government Funds) between October 25, 2013 and June 6, 2017. JA120.

### C. The Decision on Appeal

The parties engaged in extensive fact and expert discovery. Defendants produced more than 22,000 documents from the files of over a dozen individuals, including three current or former Committee Co-Chairs, the Committee's Secretary Cheryl Mintzer, Goldman Sachs' ERISA counsel Alan Wilmit, and Rocaton's Anne Buehl. ECF No. 141 at 3. Plaintiff also took the depositions of seven fact witnesses (JA449), and the parties submitted reports from seven experts, each of whom was deposed (JA455; JA3787-88).

After the completion of discovery, the district court granted Defendants' motion for summary judgment in a 34-page opinion that meticulously walks through the evidentiary record developed during discovery. SA1-34. "Constru[ing] the facts in the light most favorable" to Plaintiff (SA19), the court concluded that the record fails to create a genuine issue of material fact that would require the court to hear live testimony at the scheduled bench trial (SA19-34).

*First*, the court held that there is no triable issue on Plaintiff's claim for breach of the duty of loyalty. As the court explained, absent evidence of disloyalty, "the mere possibility that Committee members may have been influenced by a desire to benefit Goldman Sachs is not enough to show a breach of the duty of loyalty." SA27.

-18-

The court determined that Plaintiff failed to adduce any such evidence. To the contrary, the record shows that (i) "Committee members received training on their fiduciary responsibilities," (ii) "no Committee member had a personal financial incentive to prefer GSAM funds," and (iii) "Committee members uniformly testified that they applied no different standard for GSAM funds than for any other fund." SA26. The court also rejected Plaintiff's argument that the GSAM funds were "outliers" because "three of the GSAM funds were rated 'not broadly recommended' by Rocaton." SA27. The court instead observed that "at least four non-GSAM funds included in the Plan's investment lineup also were rated 'not broadly recommended' by Rocaton." SA28. After reviewing the evidence on the GSAM funds' performance and fees, the court further rejected Plaintiff's contention that Defendants' supposed "delay" in removing the GSAM funds from the Plan amounted to a breach of the duty of loyalty. SA29-30.

*Second*, the court held that there is no triable issue on Plaintiff's claim for breach of the duty of prudence. The court emphasized that Plaintiff's prudence claim "rests on a single factor: the Committee did not adopt an IPS."[3] SA21. "But it is undisputed that an IPS is not required under ERISA," and "the Department of Labor has never taken the position that an IPS is required to satisfy a fiduciary's duties."

---

[3] The court correctly observed that "[t]he section of [Plaintiff's] opposition to Defendants' [summary-judgment] motion devoted to the duty of prudence focuses *only* on [Plaintiff's] complaint that Defendants lacked an IPS." SA21 n.19.

SA21.  The court held that, even if "the adoption of an IPS is a common practice among retirement plans," that "does not suggest that the choice to forgo one is a breach of any fiduciary duty."  SA22.  The court also rejected Plaintiff's contention that the Committee's failure to adopt "set criteria" to guide its review of Plan investments enabled the GSAM funds to avoid scrutiny.  SA21.  "Because [Plaintiff] cannot show that a prudent fiduciary, in Defendants' position, would have acted differently," the court concluded that Plaintiff's "breach of the duty of prudence claim fails."  SA24.

*Third*, the court dismissed Plaintiff's claims that "the Committee's failure to collect fee rebates … on behalf of the Plan that supposedly were available to other plans invested in GSAM mutual funds resulted in a 'prohibited transaction.'"  SA31.  According to the court, the record shows that "Hewitt, as the Plan's recordkeeper, was ineligible to receive any revenue-sharing payments from GSAM related to the Plan" because "the Plan invested in GSAM mutual funds before April 1, 2009."  SA32.  The court further observed that "any other retirement plan for which Hewitt acted as recordkeeper and that invested in GSAM mutual funds before April 1, 2009, likewise was ineligible for revenue-sharing payments from GSAM."  SA32.  The court thus held that "the Plan was treated no less favorably 'than other comparably situated plans.'"  SA33.

-20-

*Fourth*, the court rejected Plaintiff's claim that "Goldman Sachs breached its duty to monitor Plan fiduciaries." SA33. "Because this claim is derivative of [Plaintiff's] other claims, it fails for the same reasons." SA33. "In any event," the court found, "there is no evidence to support this claim." SA33.

## SUMMARY OF ARGUMENT

At summary judgment, it was time for Plaintiff "to put up or shut up," *Weinstock* v. *Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), and support his claims with "specific facts" creating a genuine issue for trial, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "[U]nsupported allegations do not create a material issue of fact." *Weinstock*, 224 F.3d at 41. After carefully examining the 189 exhibits submitted by the parties, testimony from seven fact witnesses, and reports and testimony from the parties' experts, the district court correctly held that there is no need for a bench trial in this case because Plaintiff failed to support his claims with sufficient evidence.

On appeal, Plaintiff does not identify any evidence that the district court overlooked or any material facts that are in dispute. The decision below therefore should be affirmed.

I. The district court properly concluded that Plaintiff failed to present sufficient evidence of a breach of the duty of loyalty. Although retirement plans are expressly permitted to offer affiliated mutual funds if they comply with PTE 77-3's

requirements, Plaintiff argues that the Committee violated its duty of loyalty because offering GSAM funds as Plan investment options created a potential conflict of interest.  Br. 25-32.  The evidence shows, however, that Defendants employed a rigorous process to manage potential conflicts, including extensive training for Committee members, advice from experienced ERISA counsel, and support from an independent investment advisor.

As part of that rigorous process, the Committee held the five challenged GSAM funds to the same standard as the dozens of other non-GSAM options offered by the Plan.  Committee members uniformly testified that they never gave GSAM funds preferential treatment.  In fact, the Committee removed three GSAM funds from the Plan in the two years before the class period and then removed an additional seven GSAM funds, including the five challenged funds, from the Plan during the class period—all years before this action was filed.  Although Plaintiff contends that the Committee should have removed the five challenged funds from the Plan at the beginning of 2014, the record demonstrates that the Committee acted when three of the challenged funds first began to exhibit underperformance for over a quarter during the class period in 2016.  Contrary to Plaintiff's assertion, the Committee did not "ignore[] the advice of its investment advisor to jettison" those funds sooner.  Br. 2, 21-22.  As support, Plaintiff relies entirely on Rocaton's "Not Broadly

Recommended" rating of three funds, but the evidence conclusively establishes that this manager rating was *not* a recommendation by Rocaton to sell the investment.

Plaintiff further ignores that the Committee regularly considered the fees charged by all Plan investment options, including the GSAM funds. Plaintiff nevertheless criticizes the Committee for retaining the challenged GSAM funds as mutual funds despite the supposed "availability of less costly separate accounts for these same funds." Br. 29. In fact, the challenged GSAM funds could not be offered as separate accounts because the Plan could not pay GSAM a management fee for separate accounts under ERISA's prohibited-transaction rules and GSAM was unwilling to manage the investments without a fee.

In trying to find preferential treatment, Plaintiff also accuses the Committee of applying a biased selection process in choosing *new* Plan investment options. Br. 27-28. But that argument does not apply to the five challenged GSAM funds, which were added to the Plan between 1990 and 2002—more than a decade before the class period. JA1262. Rather, it applies only to the Committee's selection of two GSAM funds that are not at issue here: the Emerging Markets Equity and Strategic Income Funds. SA2 n.3. The argument is also wrong in any event. Plaintiff misconstrues a single witness's answer to a single question and mischaracterizes a single email from among the many thousands that were produced.

II.  The district court properly held that Plaintiff failed to present sufficient evidence of a breach of the duty of prudence, which "focuses on a fiduciary's conduct in arriving at an investment decision, not on its results." *Sacerdote* v. *New York Univ.*, 9 F.4th 95, 107 (2d Cir. 2021) (quotation omitted).  The evidence shows that the Committee met at least four times a year (often more frequently) to review the performance of all Plan investment options.  The Committee also digested an enormous volume of written materials from Rocaton, including monthly and quarterly performance reports and detailed fee analyses.  Plaintiff does not contest any of this evidence.

Nor does Plaintiff challenge the district court's determination that his duty-of-prudence claim "rests on a single factor:  the Committee did not adopt an IPS." SA21.  Plaintiff argues that Defendants "violated their duty of prudence" because they "had no formal criteria for selecting or monitoring the Plan's investments." Br. 32.  As the district court recognized, however, ERISA does not impose such a rigid requirement on fiduciaries (SA21-22), and Plaintiff does not cite any case law supporting his argument that the Committee breached its duty of prudence because it did not adopt an IPS.

There is also no evidentiary support for Plaintiff's contention that the absence of an IPS "led to a rudderless process that allowed the GSAM funds to linger without scrutiny."  Br. 32.  In so arguing, Plaintiff recycles many of the same factual

assertions that he offers in support of his duty-of-loyalty claim. Br. 35-42. By not presenting those arguments below in opposing summary judgment on his duty-of-prudence claim, Plaintiff forfeited them. The arguments also are meritless. The evidence shows that the Committee (i) sought the lowest fees available for the GSAM funds and could not offer them as separate accounts, (ii) removed GSAM funds from the Plan both before and during the class period, and (iii) appropriately evaluated the three challenged GSAM funds that supposedly underperformed when they began to exhibit some underperformance for over a quarter in 2016.

III.  The district court correctly rejected Plaintiff's prohibited-transaction claims because the Plan was treated "on a basis no less favorably" than other similarly situated plans. Plaintiff does not dispute that the Plan's recordkeeper Hewitt was *ineligible* to receive fee rebates from GSAM for Plan assets under Hewitt's contract with GSAM because the Plan opened accounts with GSAM funds before April 1, 2009. SA32; Br. 44. This exclusion in Hewitt's contract with GSAM applied equally to all other plans that invested in GSAM funds before that date. Accordingly, the Plan's "dealings" with GSAM were "on a basis no less favorable to the plan than such dealings [were] with other" similarly situated plans. PTE 77-3(d). Goldman Sachs' ERISA counsel testified that he and others asked GSAM to waive this contractual exclusion for the Plan but that GSAM refused because "that would require them to waive it for other clients." JA3833.

-25-

IV.  The district court properly dismissed Plaintiff's duty-to-monitor claim because that claim is derivative of Plaintiff's other defective claims and is unsupported by the evidence.

## ARGUMENT

## I.  The District Court Correctly Held That Plaintiff Failed to Present Sufficient Evidence of a Breach of the Duty of Loyalty.

ERISA's duty of loyalty "requires a 'fiduciary' to 'discharge his duties with respect to a plan solely in the interest of the participants.'" *Varity Corp.* v. *Howe*, 516 U.S. 489, 506 (1996) (quoting 29 U.S.C. § 1104(a)(1)).  As the district court correctly found, Plaintiff "has not pointed to any evidence demonstrating the Committee [instead] 'acted for the purpose' of advancing Goldman Sachs' interests."  SA27.  Plaintiff points to nothing on appeal to alter that conclusion.[4]

As Plaintiff freely acknowledges (Br. 26), "a conflict of interest alone is not a per se breach" under ERISA, *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 842 F. Supp. 2d 614, 649 (S.D.N.Y. 2012), and "a plan fiduciary does not breach its duty of loyalty simply by offering the plan sponsor's financial products," *Patterson* v. *Morgan Stanley*, 2019 WL 4934834, at *12 (S.D.N.Y. 2019).  It is

---

[4] Plaintiff asserts that summary judgment is "rarely" appropriate in breach-of-fiduciary-duty cases.  Br. 25.  But "[c]ourts routinely grant summary judgment in breach of fiduciary duty cases brought pursuant to ERISA."  *McCabe* v. *Capital Mercury Apparel*, 752 F. Supp. 2d 396, 404 & n.74 (S.D.N.Y. 2010) (citing cases); *see*, *e.g.*, *Alas* v. *AT&T Servs., Inc.*, 2021 WL 4893372 (C.D. Cal. 2021); *Birse* v. *CenturyLink, Inc.*, 2020 WL 1062902 (D. Colo. 2020).

therefore "not enough for a plaintiff to identify a potential conflict of interest from the defendant's investment in its own proprietary funds." *Moitoso* v. *FMR LLC*, 451 F. Supp. 3d 189, 204 (D. Mass. 2020). Rather, a plaintiff must present evidence showing that the defendant "acted *for the purpose* of providing benefits to itself" rather than plan participants. *Ferguson* v. *Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *4 (S.D.N.Y. 2019).

Plaintiff failed to make that showing here. The record indisputably establishes that the Committee used a rigorous process to manage potential conflicts, held GSAM funds to the same standard as non-GSAM funds, and acted solely in the interests of Plan participants. On appeal, Plaintiff does not identify any disputed material facts requiring a trial on his loyalty claim.

## A. The Committee Employed a Rigorous Process to Manage Conflicts of Interest.

Contrary to Plaintiff's assertion that "the Committee used a conflicted process" (Br. 13), the evidence plainly shows that the Committee was attuned to potential conflicts and employed a robust process to manage them.

Upon joining the Committee, each new member received extensive one-on-one training about conflicts of interest and was instructed to treat GSAM funds "exactly the same" as other plan options. SA4; SA26; JA518. At Committee meetings, members received further training on their fiduciary responsibilities and updates on legal and regulatory developments. SA4; JA1265-67; JA1758. As

Plaintiff's expert conceded, it is a "sad but true" reality that "only a minority of plan sponsors provide fiduciary training to their committees." JA1758. Not only did Goldman Sachs provide such training, but experienced ERISA counsel attended every Committee meeting to advise members on their fiduciary duties and their management of potential conflicts. JA554-55; JA1096-1154.

The Committee also retained Rocaton, a leading investment consultant, to act as an independent fiduciary and provide impartial advice. SA4; JA144-46; JA1267. The Committee's retention of Rocaton demonstrates "its desire for independent, objective advice" on Plan investments. JA1267. There is no dispute about Rocaton's qualifications. Plaintiff's expert acknowledged that "Rocaton is pretty impressive" (JA1758), and Rocaton's extensive client list included 38 defined-contribution plans like the Plan (JA619; JA1267; JA602). During the class period, Rocaton had no economic interest in Goldman Sachs or any of the GSAM funds and thus provided the Committee with impartial "investment expertise." JA600; JA618; JA1267.

Committee members likewise had no personal incentive to favor GSAM. As the district court found, "no Committee member had a personal financial incentive to prefer GSAM funds over nonproprietary options." SA26. Plaintiff's expert conceded that she has "not seen evidence" that Committee members had a personal "incentive" to favor "investment options managed by GSAM." JA1750.

-28-

In sum, there is no evidentiary support for Plaintiff's contention that the Committee "failed to adopt procedures to protect Plan participants from conflicts of interest." Br. 25.

### B. The Committee Held GSAM Funds to the Same Standard as Other Plan Investments.

Plaintiff asserts that the Committee "consistently maintained a lower standard" for GSAM funds. Br. 25. The district court found, however, that "Committee members uniformly testified that they applied no different standard for GSAM funds than for any other fund, and that they evaluated each investment option on its merits." SA26; *see* JA521; JA541; JA548; JA554. Plaintiff does not identify any evidentiary basis to conclude that this testimony is false. Even Plaintiff's expert admitted that she has no reason to question the "honesty" or "integrity" of any Committee member. JA1750.

Contrary to Plaintiff's unsupported claim of a double standard, the Committee acted appropriately when GSAM funds underperformed. In November 2010, the Committee asked Rocaton to evaluate the performance of five GSAM funds, including three of the challenged funds. JA1037-63; JA1284-85. When that review showed that one fund—GSAM's real estate fund—had underperformed, the Committee removed it from the Plan in 2011 and replaced it with a non-GSAM fund. JA1035; JA1285. In December 2011, the Committee asked Rocaton to evaluate *all* of the GSAM funds in the Plan. JA1065-90; JA1285-86. When that review showed

-29-

underperformance by two additional GSAM funds, the Committee again acted—it removed those two funds from the Plan in January 2012, replacing them with non-GSAM funds. JA1032; JA1285-86. Plaintiff ignores this evidence.

The Committee's actions during the class period tell the same story. When three of the challenged GSAM funds began to show underperformance for a quarter or more in 2016 (JA1812), the Committee asked the managers of two of those funds to attend the Committee's meeting in September 2016 (JA571-73) and scheduled an *ad hoc* meeting in October 2016 (JA578-79) to discuss the funds further. After the Committee's review expanded to encompass the Plan's entire "investment lineup" (JA578), the Committee removed seven GSAM funds from the Plan, including all five challenged funds, in December 2016 (JA575-76) and April 2017 (JA584-85)—more than two years *before* this litigation was filed.

These facts bear no resemblance to the cases Plaintiff cites. Br. 26-27, 32. In *Fuller* v. *SunTrust Banks, Inc.*, 2019 WL 5448206, at *24 (N.D. Ga. 2019), the evidence showed "a pattern of allowing proprietary funds to underperform for extended periods, particularly compared to non-proprietary funds." As the court noted, "[w]hereas the Plan Committee swiftly removed [a nonproprietary fund] when it began to perform poorly, the Plan Committee allowed the proprietary [fund], despite multiple quarters of double red ratings, to linger in the Plan." *Id*. Similarly, another proprietary fund "was rated double red for six quarters between 2007 and

-30-

2009 yet remained in the Plan until 2010." *Id*. The court further stressed that the committee in *SunTrust* received a presentation explaining that shifting assets to nonproprietary funds would represent a "tangible loss of revenue to the Company," thus suggesting "improper motives" for the committee's delay in removing the proprietary funds. *Id.* No such evidence exists here.

Likewise, in *Baird* v. *BlackRock Institutional Trust Co.*, 403 F. Supp. 3d 765, 780 (N.D. Cal. 2019), the district court declined to dismiss a duty-of-loyalty claim because of allegations that the defendants had "diverted hundreds of millions of dollars from the Plan's assets to seed newly-launched [proprietary] funds and added them to the lineup." The court held that those allegations raised a plausible inference that the defendants "*improperly* favored their proprietary funds by selecting and retaining" them. *Id*. Again, no evidence of similar favoritism exists here.

### C.   The Evidence Does Not Support Plaintiff's Claim of Favoritism Toward GSAM Funds.

Plaintiff argues that the Committee's "failure to control its conflicts of interest led it to" tolerate GSAM funds' alleged underperformance and higher costs and to apply a less rigorous standard when adding new GSAM funds to the Plan. Br. 26. The district court correctly found that "[n]one of these arguments is supported by evidence sufficient to defeat summary judgment." SA25.

### 1. The Committee carefully monitored the GSAM funds' performance.

Plaintiff argues that the Committee, in not removing the challenged GSAM funds from the Plan until 2016-2017, tolerated those funds' underperformance and prioritized Goldman Sachs' interest. Br. 30-32. After considering each of these arguments, the district court correctly concluded that Plaintiff "cannot point to any evidence showing a breach of the duty of loyalty." SA31.

**Performance**. Plaintiff contends that, as of September 2013, three of the challenged GSAM funds (the Large Cap Value, Mid Cap Value, and High Yield Funds) trailed their benchmarks over various time periods. Br. 30. But those funds' performance during those time periods was adversely affected by a *single* year (2011) when each underperformed its benchmark. JA1814-16; JA3098; JA3102; JA3111. "Precipitously selling" plan investments "in response to disappointing short-term losses," such as those experienced in 2011, "is one of the surest ways to frustrate the long-term growth of a retirement plan." *Smith* v. *CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022).

The Committee did not sit idly by in response to fund underperformance in 2011. In December 2011, the Committee asked Rocaton to review all of the GSAM funds in the Plan and removed three GSAM funds from the Plan at the end of 2011 and beginning of 2012, while electing to retain the five challenged funds. JA1032; JA1035; JA1065-90; JA1285-86. The decision to retain the five challenged funds

was vindicated in 2012—the last full year before the start of the class period—when each fund *outperformed* its benchmark. JA1814-16.

Plaintiff fails to support his broad assertion that the Committee "tolerated" underperformance by GSAM funds that it did not tolerate for non-GSAM funds. Br. 31. The evidence shows that the challenged funds' long-term performance was on par with that of other investment options. For the ten-year period before January 1, 2014—when Plaintiff claims the Committee should have removed the challenged funds from the Plan—the three supposedly underperforming GSAM funds were ranked in the top 28th, 47th, and 57th percentiles.[5] SA9; JA1473; JA1485; JA1491.

Plaintiff asserts that the Committee did not specifically discuss the challenged GSAM funds at its meetings between September 2013 and September 2016. Br. 31. The evidence shows, however, that the Committee was monitoring those funds' performance throughout that period. Plaintiff "does not dispute that in advance of Committee meetings, Committee members received a packet of information from Rocaton[,] including information about each of the Plan's investment options," and that Rocaton "began each quarterly meeting by presenting information about Plan

---

[5] Plaintiff asserts that the district court "erred in crediting" the testimony of "Goldman's expert" about ten-year performance (Br. 39), but Plaintiff's cited evidence does not undercut those historical numbers (JA2015-19; JA2024-26). Instead, Plaintiff's expert relied on a flawed "consistency analysis" that did not preclude summary judgment. SA9 n.14.

performance." SA23-24. Plaintiff's contention that "Committee members barely even considered this data" (Br. 16) is false. As support, Plaintiff cites the testimony of Committee Co-Chair Paula Madoff, who instead emphasized that "Rocaton would go through their book" at the beginning of each meeting and "specifically highlight" any investment option "that was underperforming." JA2226-27.

The evidence further shows that the Committee appropriately reviewed the three supposedly underperforming GSAM funds when Rocaton's monthly reports showed that they had underperformed their benchmarks on a rolling one-year basis by at least one standard deviation for a full quarter or more in 2016. JA1315-18; JA1812. Committee members testified that in reviewing these monthly reports, they watched for funds that underperformed over "multiple periods" by "multiple standard deviation[s]." JA 3792. As the district court stated, Plaintiff "does not point to any law showing that Defendants' consideration—and eventual removal— of the underperforming funds, including their analysis of the funds' long-run performance, amounts to a breach of the duty of loyalty." SA29.

**Rocaton's Manager Ratings**. Plaintiff notes that Rocaton rated three of the challenged funds (the Large Cap Value, Mid Cap Value, and High Yield Funds) "Not Broadly Recommended." Br. 31. Relying on those ratings, Plaintiff asserts that the Committee "ignored the advice of its investment advisor to jettison" those

three funds (Br. 2, 21-22) and accuses the Committee of "overriding the advice of [its] own independent investment advisor" (Br. 11). Those assertions are false.

The fact that Rocaton does not "broadly" recommend an investment is not a recommendation to sell the investment. As Rocaton's Anne Buehl explained, "[t]his rating was *not* a recommendation by Rocaton to remove a fund as an investment option." JA151. Rather, "Rocaton maintained a 'Sell' rating" for that purpose. JA151. According to Ms. Buehl, "[m]any of Rocaton's clients held investments that Rocaton had rated 'Not Broadly Recommended,' including defined contribution plans," and "Rocaton believed it was appropriate for clients to invest in funds that had received a 'Not Broadly Recommended' rating, including making them available as investment options in their retirement plans." JA151.

Rocaton's manager ratings also were "only a small part of the information that [Rocaton] provided to the Committee about the Plan's investment options." JA150. The evidence shows that Committee members considered Rocaton's ratings together with the other information they received but, at times, disagreed with the ratings, particularly when members believed they "had better information" based on their "direct knowledge of some of the managers" and when members thought that Rocaton had given too much weight to "personnel turnover." JA3808-09.

The three challenged GSAM funds were not outliers. "[D]uring the class period, at least four non-GSAM funds included in the Plan[] … also were rated 'not

-35-

broadly recommended' by Rocaton." SA28; JA964-67. And the Committee retained two funds managed by PIMCO in the Plan even "after Rocaton downgraded its rating of them to 'sell.'" SA28; JA569; JA1026. The district court thus correctly found that "there is no basis for the suggestion that the Committee, in considering Rocaton's ratings, held GSAM funds to a different standard." SA28.

Finally, ERISA does not require a fiduciary to defer to an outside advisor's ratings. To the contrary, a fiduciary can breach ERISA's duty of loyalty by deferring unduly to an outside firm. *See Garthwait* v. *Eversource Energy Co.*, 2022 WL 3019633, at \*2, \*18 (D. Conn. 2022). Here, the Committee properly considered Rocaton's ratings but did not give them determinative weight. SA12-13; SA28.

**Removal of the Challenged Funds**. Plaintiff argues that the Committee removed the challenged funds "because it was concerned about litigation risk," which supposedly shows that the Committee "was thinking about Goldman first." Br. 31-32. But it is not evidence of a breach of the duty of loyalty that the Committee was advised of recent ERISA case law and considered those legal developments in removing the GSAM funds. As the district court concluded, Plaintiff "does not and cannot show that the Committee's consideration of the litigation environment in choosing to remove the challenged funds in any way amounts to a breach of its duty of loyalty." SA31.

### 2. Plaintiff's complaints about the GSAM funds' fees do not withstand scrutiny.

Plaintiff complains that the Committee "retained the Challenged GSAM funds as … mutual funds despite the availability of less costly separate accounts for these same funds." Br. 29. In fact, the GSAM funds were *not* available to the Plan as separate accounts. ERISA's prohibited-transaction rules permit a plan to pay fees to an affiliate only if the plan's investment is made through *mutual funds* registered under the Investment Company Act of 1940. PTE 77-3, 42 Fed. Reg. 18,734 (Apr. 8, 1977). Because separate accounts do not fall within that exemption, a plan cannot pay a fee to an affiliate to manage separate accounts. *Patterson*, 2019 WL 4934834, at *9 ("[T]he Court is not aware of an exemption which permits fiduciaries to invest plan assets in single-client 'separate accounts' in which the fiduciary has an interest or receives fees.").

The district court thus correctly held that "the Plan could make the challenged funds' strategies available to Plan participants through separately managed accounts only if GSAM was willing to forgo any management fees paid by the [P]lan." SA13-14; JA145; JA530; JA3831-32. "GSAM was not willing to do so," which made "that option unavailable to the Committee." SA14; JA145; JA530. If Plaintiff is correct that a plan cannot offer affiliated mutual funds because separate accounts are invariably less expensive, PTE 77-3's exemption expressly permitting plans to offer such mutual funds would be a dead letter.

-37-

Plaintiff's assertion that Rocaton generally advised the Committee "to invest in separate accounts … instead of mutual funds" (Br. 7-8) is misleading. Rocaton's Anne Buehl testified that she "did not believe that including [the GSAM funds] as separate accounts was an option the Committee could … consider" given ERISA's prohibited-transaction rules. JA145.

Even if the Committee could offer the challenged GSAM funds as separate accounts, "nothing in ERISA requires a Plan to offer separate accounts in lieu of reasonably-priced mutual funds." *Patterson*, 2019 WL 4934834, at *9. The "regulatory and transparency requirements of separate accounts … differ significantly from those of mutual funds, making direct comparison between them 'apples-to-oranges.'" *Moitoso*, 451 F. Supp. 3d at 210 n.7. During the relevant period, the challenged GSAM mutual funds were reasonably priced—in fact, they charged *lower* fees than the institutional mutual fund average and median. JA932; JA958. The Plan also offered five non-GSAM investments as mutual funds, not separate accounts, thus defeating any claim that the GSAM mutual funds were unique. JA932; JA958.[6]

---

[6] Although the Plan offered GSAM's Laddered Fixed Income Fund as a separate account, that was a unique arrangement where GSAM agreed not to charge the Plan a fee because of the history of that fund. JA1121-22; JA1675-76; JA3832. GSAM was unwilling to enter into a similar arrangement for the challenged GSAM funds. JA145; JA530.

Lastly, Plaintiff complains that the Committee "did not secure fee rebates" for the GSAM funds. Br. 29-30. But Plaintiff "does not dispute that the Plan … was ineligible to receive any revenue-sharing payments from GSAM related to the Plan." SA32. On the Committee's behalf, Goldman Sachs' ERISA counsel, together with others, explored with GSAM the "possibility of being able to participate" in revenue sharing. JA3833. GSAM responded that it was unwilling to waive the exclusion in its agreement with Hewitt for the Plan "because that would require them to waive it for other clients and they weren't willing to waive it for other clients." JA3833. Accordingly, Plaintiff's assertion that "the Committee failed to secure fee rebates that were readily available to the Plan" (Br. 6, 9) is false.

**3.  Plaintiff's arguments about the Committee's selection criteria do not apply to the five challenged funds.**

Plaintiff argues that the Committee adopted a "disloyal process for selecting" *new* Plan investment options. Br. 27. According to Plaintiff, "[d]uring the Class Period, the Committee added two GSAM mutual funds that were not recommended by Rocaton over cheaper, nonproprietary options." Br. 16. But those two funds—the Emerging Markets Equity and Strategic Income Funds—are *not* at issue in this case. SA2 n.3; SA30. Plaintiff did not challenge them in his complaint because they "had positive 5-year performance records" during the class period (JA22 (¶64 n.4)), and the class certified by the district court does not include Plan participants who invested in those two GSAM funds (JA120-21).

-39-

By contrast, the five challenged GSAM funds were added to the Plan between 1990 and 2002 (JA1262)—more than a decade before the class period starts—and Plaintiff does not challenge the Committee's *selection* of those funds. Plaintiff's expert conceded that she is offering no opinion "with respect to … the selection" of the five challenged funds. JA4441. Even if the Committee's selection of the Emerging Markets Equity and Strategic Income Funds during the class period could "shed light" on the Committee's "motivations" for retaining the five challenged funds, as Plaintiff contends, the district court properly held that this evidence "does not show that the Committee was disloyal." SA30.

Moreover, the evidence does not support Plaintiff's assertion that the Committee's "selection process" for new Plan investment options improperly favored GSAM funds. Br. 28. According to Plaintiff, "the Committee required Rocaton to present GSAM funds as options regardless of their ratings." Br. 27. There was no such requirement. As his only support, Plaintiff cites the following testimony of Committee Co-Chair Joseph Gleberman: "I think that Rocaton, when they were presenting to us, whether they were asked or not, would generally have to comment on whether GSAM had a fund that was available … I think it's sort of human nature, if the client has something in that area, they would comment on it." JA2173; JA2931. Mr. Gleberman stated, however, that he had no recollection of the Committee ever asking (much less requiring) Rocaton to comment on GSAM funds.

JA2173.  Rocaton's Anne Buehl similarly stressed that she was "not aware of the Committee having a policy of 'generally' including a GSAM option for consideration together with non-GSAM funds."  JA153.  As the district court held, Plaintiff "does not explain how Rocaton's general inclination to 'comment' on whether GSAM funds were available" demonstrates that the Committee "gave special treatment to the GSAM funds."  SA26.

Similarly, Plaintiff's assertion that "Goldman executives were encouraged to contact Committee members to promote GSAM products" (Br. 15) is false.  Plaintiff cites no evidence that "Goldman executives" were "encouraged" to "lobby" Committee members.  Br. 15, 27.  Instead, he relies on a single email from a single GSAM employee to Committee Co-Chair Jeffrey Goldenberg in September 2015 that included a "quick one-pager on the GS EME [Emerging Markets Equity] fund." JA1092.  Mr. Goldenberg simply forwarded that email to the Committee's Secretary, stating:  "Sean Gallagher called me today and wanted to see if there was a place for the GSAM EME fund in our 401k program given its strong record.  I told him that I would pass the information along to you and the committee can opine."  JA1092. Mr. Goldenberg testified that this was the same "process that was used, whether it was a Goldman Sachs inquiry … or [a] non-Goldman Sachs inquiry." JA543.  This one email from one person, out of the thousands of emails produced in this case, is

not evidence that "Goldman executives" were "encouraged" to "lobby" Committee members.  Br. 15, 27.

## II. The District Court Correctly Held That Plaintiff Failed to Present Sufficient Evidence of a Breach of the Duty of Prudence.

Plaintiff also asserts that Defendants "violated their duty of prudence." Br. 32.  This duty "focuses on the fiduciary's conduct in arriving at an investment decision, not on its results." *Pension Ben. Guar. Corp.* v. *Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013).  ERISA requires a fiduciary to "use 'the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use.'" *Id*. at 715.  Courts evaluate a fiduciary's actions "based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of hindsight."  *Id*. at 715-16.

As the Supreme Court recently stated, "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes* v. *Northwestern Univ.*, 142 S. Ct. 737, 742 (2022).  ERISA "does not give the federal courts a broad license to second-guess the investment decisions of retirement plans." *Smith*, 37 F.4th at 1162.

The district court here correctly held that Plaintiff's duty-of-prudence claim fails under those standards.  SA24.  Citing the Plan's lack of an IPS, Plaintiff argues

that the Committee "had no formal criteria for selecting and monitoring the Plan's investments." Br. 32. But ERISA does not require fiduciaries to adopt an IPS, and Plaintiff's contention that the absence of an IPS "led to a rudderless process" (Br. 32) finds no support in the record.

### A. The Committee Employed a Prudent Process.

The duty of prudence is "largely a process-based inquiry." *Smith*, 37 F.4th at 1166. It requires ERISA fiduciaries to "monitor[] and review[] investments … in a manner that is reasonable and appropriate to the particular investments … and strategies involved." *Tibble* v. *Edison Int'l*, 575 U.S. 523, 529 (2015). The Committee here satisfied that standard: its members were experienced financial professionals; they received extensive training, were supported by full-time staff, and were advised by an independent investment advisor; and they closely monitored the performance and costs of all Plan investment options, including the GSAM funds, on a regular basis.

Plaintiff does not dispute that the Committee consisted of "consummate financial professionals" who were "highly regarded" and possessed "deep expertise in the markets." JA1756. Plaintiff's expert agreed that Committee members' experience "compares favorably" to that of "fiduciaries of other defined contribution plans" who possess "limited investment knowledge." JA1756.

Nor does Plaintiff dispute that Committee members received extensive training.  SA4.  Plaintiff's expert described this training as "[o]ne of the most important things a plan sponsor can do for the members of its retirement plan committee" and admitted that "only a minority of plan sponsors provide fiduciary training to their committees."  JA326; JA1758.

And Plaintiff does not dispute that the Committee was supported by highly skilled and experienced staff.  As the district court noted, the Committee "was assisted by a full-time, highly qualified secretary … with extensive industry experience."  SA3.  The hiring of such support was "indicative of the importance that Goldman Sachs placed on the Retirement Committee's … selection and monitoring of Plan investment options."  JA1263.  Experienced ERISA counsel also advised the Committee and attended every meeting.  SA4; JA1096-1154.  Alan Wilmit, whom the district court described as "an experienced, highly-qualified" ERISA lawyer (SA4), has attended Committee meetings for 22 years.  JA554.

In addition, the Committee retained an independent investment advisor. "Rocaton provided the Committee with detailed information about each of the Plan's investment options, including monthly and quarterly performance reports, written reports summarizing meetings with investment managers, Rocaton commentary and other information requested by the Committee."  JA150.  Plaintiff's expert testified: "I think Rocaton is pretty impressive, from what I have seen.  I really do."  JA1758.

-44-

Committee members also met regularly to review the performance of Plan investment options. SA6. The Committee Co-Chairs worked with Rocaton and the Committee's Secretary to prepare detailed agendas for each meeting. JA539. Rocaton's Anne Buehl stated that she "began each quarterly Committee meeting by presenting detailed information about the performance of all of the Plan's investment options, including each of the GSAM funds." JA152-53. The Committee also heard presentations from managers of current or prospective Plan investments. JA1291-92. According to Plaintiff's expert, the Committee's direct access to these outside investment managers was "very, very atypical. But it's a good thing. I would like to emphasize it's a very good thing." JA1761. These manager presentations, followed by "a 'significant level of Q&A,'" gave Committee members "unique" access to information. JA1291; JA1760-61.

Simply stated, the Committee "engage[d] in a reasoned, prudent decisionmaking process, using appropriate methods to investigate the merits of retaining the Company [f]unds as … investment option[s]." *DiFelice* v. *U.S. Airways, Inc.*, 497 F.3d 410, 421 (4th Cir. 2007) (quotation omitted). The record provides ample evidence of the Committee's "thorough investigation" of the Plan's investment options, including the five challenged funds. *Id.*

### B.    The Committee Did Not Breach Its Duty of Prudence by Not Adopting an IPS.

The district court correctly concluded that Plaintiff's "claim that Defendants breached their duty of prudence rests on a single factor:  the Committee did not adopt an IPS."  SA21 & n.19.  Plaintiff does not challenge that conclusion on appeal.  Noting "Goldman's failure to adopt an IPS," he argues that "Goldman violated its duty of prudence by failing to adopt any formal criteria for selecting and monitoring Plan investments."  Br. 33.  That argument fails as a matter of law.

"[I]t is undisputed that an IPS is not required under ERISA."  SA21.  ERISA's duty of prudence is not a rote box-checking exercise, requiring either an IPS or the adoption of "formal criteria" to "guid[e] the selection, monitoring, and removal of investments."  Br. 33-34.  What matters is whether the fiduciary "act[ed] in a prudent manner" under "the circumstances then prevailing."  *Pension Ben. Guar. Corp.*, 712 F.3d at 716.  While Plaintiff contends that IPSs are commonplace (Br. 34), the district court properly determined that this contention "does not suggest that the choice to forgo one is a breach of any fiduciary duty under ERISA."  SA22.

No court has ever held that ERISA requires the adoption of an IPS or some other formal document.  To the contrary, courts have rejected such a rigid requirement.  In *Taylor* v. *United Technologies Corp.*, 2009 WL 535779, at *10 (D. Conn. 2009), the plaintiff's expert faulted the plan sponsor "for failing to create a written Investment Policy Statement," but the court held that "ERISA does not

require a fiduciary … to create such a document."  The court in *White* v. *Martin*, 286
F. Supp. 2d 1029, 1039 (D. Minn. 2003), reached the same conclusion, noting that
the plaintiff "has cited no cases supporting his contention" that ERISA requires the
adoption of a formal "policy statement" and that "the Court has found none."

Even Plaintiff's expert agrees that an IPS "is not required under ERISA" and
that the Department of Labor "has never taken the position that an IPS is a required
document."  JA328-29; JA1752; SA21.  Although Plaintiff's expert contends that
adoption of an IPS is a "best practice" (JA329), she acknowledges that "ERISA's
duty of prudence doesn't mandate a best practice," only a prudent process (JA1754).

Plaintiff's authorities are not to the contrary.  Br. 34-35.  To start, *Liss* v.
*Smith*, 991 F. Supp. 278 (S.D.N.Y. 1998)—which Plaintiff's own expert described
as "[a]n outlier to [the] general rule" (JA329)—is easily distinguishable.  That case
"involved large-scale, 'gross mismanagement, if not worse,' in the Teamsters union,
including embezzlements, kick-backs, skimmed profits, and conflicts of interest."
*White*, 286 F. Supp. 2d at 1040 (discussing *Liss*).  After recognizing that "ERISA
does not contain a specific requirement that a written policy be maintained," the *Liss*
court held on that case's extreme facts that "the absence of such a policy, coupled
with the other acts and omissions by trustees of these Funds, constituted a breach of
fiduciary duty."  991 F. Supp. at 296.  The district court here correctly concluded

-47-

that "the absence of a written policy alone was not dispositive [in *Liss*] and that it was just one factor."  SA22.

In *Vellali* v. *Yale University*, 2022 WL 13684612, at *17-18 (D. Conn. 2022), the court denied the defendants' summary-judgment motion because the record contained extensive "evidence of deficiency" in plan management, including that a single person oversaw 100 different investments for years, an investment committee was not created until over two years after one was authorized and recommended, and the committee then met only once a year and relied on deficient reports from its advisors and deficient benchmark and peer-group choices provided by an interested party.  After recounting all of this evidence of a lack of prudence, the court also noted the absence of an IPS.  *Id*. at *19.

In *Garthwait* v. *Eversource Energy Co.*, 2022 WL 3019633, at *2 (D. Conn. 2022), the court allowed the plaintiff's claims to proceed even though the plan had an IPS because the evidence showed that committee members "were unfamiliar with basic concepts necessary to monitor Plan investments" and "left important decisions in the hands of the staff rather than Committee members."  That is a far cry from what the evidence shows here.[7]

---

[7] Plaintiff suggests that "the Plan required the Committee to establish investment policies for the Plan."  Br. 33.  The cited Plan language, however, does not require the adoption of an IPS.  JA283.

-48-

Furthermore, as the district court observed, Plaintiff "does not point to any evidence that an IPS would have caused the Committee to act differently." SA23. Even Plaintiff's expert admitted that "any opinion" that an IPS might have improved Plan performance would be "hypothetical" and based on "hindsight." JA1747. The district court thus concluded that Plaintiff's "claim that the Committee did not engage in a prudent process because it did not set out in writing an IPS is at best speculation." SA24.

### C. The Evidence Does Not Support Plaintiff's Criticisms of the Committee's Process.

Notwithstanding the Committee's rigorous process for monitoring Plan investments, Plaintiff argues that the absence of an IPS "allowed the GSAM funds to linger" longer than they should have. Br. 32. As support, Plaintiff simply repackages many of the same arguments he advances in support of his duty-of-loyalty claim, asserting that the Committee acted imprudently by failing to (i) evaluate the fees charged by the GSAM funds, (ii) investigate alternative investment options, (iii) appropriately monitor the GSAM funds, and (iv) remove the GSAM funds in a timely manner. Br. 35-42.

In opposing summary judgment, Plaintiff did not make any of these arguments in support of his duty-of-prudence claim. He instead argued that the Committee's alleged "procedural failures" stemmed from the "lack of an IPS." ECF No. 198 at 17. As the district court rightly observed, "[t]he section of [Plaintiff's] opposition

to Defendants' motion devoted to the duty of prudence focuses *only* on [Plaintiff's] complaint that Defendants lacked an IPS." SA21 n.19. By not raising these arguments below in support of his "prudence" claim, Plaintiff forfeited them. *See Anderson Grp., LLC* v. *City of Saratoga Springs*, 805 F.3d 34, 50 (2d Cir. 2015) ("It is well settled that arguments not presented to the district court are considered waived and generally will not be considered for the first time on appeal."). Even if not forfeited, Plaintiff's new "prudence" arguments are not supported by the evidence, and they do not raise any disputed issues of material fact.

**GSAM Fees**. Plaintiff argues that the Committee's "lack of an appropriate methodology" led it to retain the GSAM funds "as more expensive mutual funds" rather than as "lower-cost separate accounts" and not to secure available "fee rebates." Br. 35-37. In making those arguments, Plaintiff misconstrues the record.

As the district court explained, "the Plan could make the challenged funds' strategies available to Plan participants through separately managed accounts only if GSAM was willing to forgo any management fees," and "GSAM was not willing to do so." SA13-14; JA145; JA530; JA3831-32. Goldman Sachs' ERISA counsel thus "advised the committee that they could not invest in a separate account managed by [GSAM] and have the plan pay [GSAM] a fee" and that "a fee other than in the

context of a mutual fund is a prohibited transaction." JA555.[8] Given PTE 77-3's express exemption for affiliated mutual funds, the Committee did not act imprudently in following this advice.

Despite PTE 77-3's express exemption, Plaintiff suggests that it was a *per se* breach of the duty of prudence to offer affiliated mutual funds when cheaper separate accounts were available. Br. 36. Not only would this argument render PTE 77-3's exemption a nullity, but there also can be no breach of the duty of prudence unless the "same service" was available for less. *Cunningham* v. *USI Ins. Servs. LLC*, 2022 WL 889164, at *4 (S.D.N.Y. 2022). Mutual funds and separate accounts are not the same service. *See Moitoso*, 451 F. Supp. 3d at 210 n.7.

In terms of fee rebates, Plaintiff "does not dispute that the Plan … was ineligible to receive any revenue-sharing payments from GSAM related to the Plan." SA32. Plaintiff instead asserts that "the Committee had a duty to attempt to renegotiate" GSAM's agreement with Hewitt—even though the Plan was not a party

---

[8] Plaintiff notes that his expert opined that the Plan could have offered separate accounts from GSAM if Goldman Sachs had "amended the Plan to authorize their inclusion." Br. 36. That is incorrect. Even if the Plan were amended, the Plan's payment of fees to GSAM to manage separate accounts still would be a nonexempt prohibited transaction. ERISA requires fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan *insofar as such documents and instruments are consistent with the provisions of [ERISA]*." 29 U.S.C. § 1104(a)(1)(D) (emphasis added). Plaintiff also suggests that the Committee could have "retained an independent fiduciary to approve the transaction." Br. 36. Department of Labor regulations, however, state that this kind of arrangement still would result in a nonexempt prohibited transaction. 29 C.F.R. § 2550.408b-2(f) (example 5).

to that agreement.  Br. 37.  Goldman Sachs' ERISA counsel, however, tried to secure from GSAM an exception for the Plan under GSAM's agreement with Hewitt, but GSAM declined.  JA3833.  Plaintiff nowhere addresses that evidence.

**Alternative Investment Options**.  Plaintiff argues that "the Committee did not appropriately … compare any of the Challenged GSAM Funds to nonproprietary options," stating that "Goldman's once-a-decade review" of GSAM funds "contained 'virtually no discussion or analysis.'"  Br. 38.  That argument does not withstand scrutiny.

At the Committee's request, Rocaton reviewed all of GSAM's funds in the Plan between December 2011 and January 2012, and the Committee reviewed them again in late 2016.  SA7-12.  That is not a "once-a-decade review."  Br. 38.  Likewise, the evidence Plaintiff cites for his contention that the Committee's review included "'virtually no discussion or analysis'" does not support that assertion. Br. 38 (citing JA2001; JA2226-27; JA2230; JA2914-15).

**Monitoring of the GSAM Funds**.  Plaintiff contends that "Goldman did not appropriately monitor *any* performance numbers for the GSAM funds."  Br. 39.  As support, he states that the minutes of Committee meetings contain "a single sentence describing the Committee's investment review at each meeting."  *Id*.  The evidence shows, however, that Rocaton's Anne Buehl "began each quarterly Committee meeting by presenting detailed information about the performance of all of the Plan's

investment options, including each of the GSAM funds." JA152-53. As the district court stated, "[t]hat the meeting minutes do not reflect a particular level of detail with respect to these discussions … does not mean that the discussions did not happen." SA24. "[T]here is no requirement that meeting minutes … be a verbatim transcript of all the issues considered by the fiduciaries." SA23. Even Plaintiff's expert agreed that meeting minutes can be "short and sweet." JA4447. Plaintiff "fails to cite a single case that sustained a claim for breach of the duty of prudence on the ground that a committee's minutes were insufficiently descriptive." SA23.

Plaintiff also ignores the Committee's work before meetings. A Committee Co-Chair testified that "[p]eople were expected to have read the material before they got to the meeting." JA3812; SA7. Another Committee member stated: "I would generally go through the package in detail shortly after receiving it, and then I would go through" it again either "the evening before the meeting or the morning of the meeting." JA3791; *see also* JA539-40; JA1308-09. Plaintiff ignores this testimony.

**Removal of the GSAM Funds**. Plaintiff asserts that the Committee failed to remove the challenged GSAM funds from the Plan "in a timely manner." Br. 41. Plaintiff speculates that, "if the Plan had an IPS," the GSAM funds "would have been removed from the Plan by the beginning of 2014 at the latest." *Id*. (quotation omitted). But that is Monday morning quarterbacking. The evidence shows that the Committee reviewed all GSAM funds in the Plan in 2011 and 2012, removing three

underperforming funds but retaining the five challenged funds. SA8-9; JA1031-32; JA1065-90; JA1285-86. After that review, the challenged funds outperformed their benchmarks in 2012 and did not exhibit any persistent underperformance until 2016. JA1812; JA1814-18. Although a plaintiff can rely on a fund's underperformance in claiming a breach of fiduciary duty, that underperformance must be "'consistent' and 'substantial' to support an inference of imprudence." *Gonzalez* v. *Northwell Health, Inc.*, 2022 WL 4639673, at *7 (E.D.N.Y. 2022) (quoting *Patterson*, 2019 WL 4934834, at *10). There is no evidence of "consistent and substantial" underperformance that should have prompted an earlier removal of the five challenged funds.

Plaintiff also does not account for the costs associated with making frequent changes to a plan's investment menu. SA12. As Defendants' expert explained, such changes "should be approached with care" because they "are disruptive to participants and may cause disengagement and confusion." JA1318.

## III. The District Court Correctly Rejected Plaintiff's Prohibited-Transaction Claims.

ERISA prohibits certain specified transactions between a plan and a party in interest. 29 U.S.C. § 1106. These prohibited-transaction rules protect plan participants "against self-dealing." *Brotherston* v. *Putnam Invs., LLC*, 2017 WL 1196648, at *9 (D. Mass. 2017). They "supplement[] the fiduciary's general duty of loyalty to the plan's beneficiaries … by categorically barring certain transactions

-54-

deemed likely to injure the … plan." *Harris Tr. & Sav. Bank* v. *Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000) (quotation omitted).

The Department of Labor, however, has promulgated an exemption for plan investments in mutual funds managed by an affiliate if certain requirements are met. PTE 77-3, 42 Fed. Reg. at 18,734-35. Under PTE 77-3(d), one of those requirement is that "[a]ll other dealings between the plan and the investment company" must be "on a basis no less favorable to the plan than such dealings are with other shareholders of the investment company."

Plaintiff contends that Defendants were not entitled to rely on the mutual-fund exemption because they did not satisfy PTE 77-3(d). According to Plaintiff, "GSAM paid fee rebates, in the form of revenue sharing, to other plans that invested in the GSAM funds, but not to the Plan." Br. 44.[9] Plaintiff argues that "Goldman committed a prohibited transaction" (Br. 42) because Defendants supposedly "failed to secure fee rebates that were readily available to the Plan" (Br. 6, 9). The factual premise for that argument is incorrect: under the governing contract, fee rebates from GSAM were not "readily available" to the Plan.

---

[9] "Revenue sharing is the practice of mutual fund asset managers" to pay "a portion of their revenue to service providers" (such as a plan recordkeeper) "to defray the costs of providing administrative and recordkeeping support in connection with investments in the fund made through a retirement plan." JA1678.

On April 1, 2009, GSAM entered into a shareholders service agreement with Hewitt, which provided recordkeeping services to the Plan and numerous other retirement plans. SA32; JA500-10. Under that agreement, GSAM paid Hewitt a fee based on eligible investments in GSAM funds by retirement plans for which Hewitt acted as recordkeeper. JA501; JA504-05; JA3832-33. The agreement provides, however, that the "fees paid shall exclude the assets … of Customers who have opened accounts with the Funds prior to April 1, 2009," the date on which GSAM and Hewitt entered into the agreement. JA508. The Plan was not a party to GSAM's agreement with Hewitt, nor was the Committee involved in negotiating its terms. JA501.

Plaintiff "does not dispute that the Plan invested in GSAM mutual funds before April 1, 2009, and that as a result, Hewitt, as the Plan's recordkeeper, was ineligible to receive any revenue-sharing payments from GSAM related to the Plan." SA32; JA501-02; JA1262. Plaintiff "also does not dispute that any other retirement plan for which Hewitt acted as recordkeeper and that invested in GSAM funds before April 1, 2009, likewise was ineligible for revenue-sharing payments from GSAM." SA32. As the district court found, "any difference in treatment" was attributable "to the fact that [other] plans simply did not use the same recordkeeper or, if they did, did not open their accounts until after April 1, 2009." SA33. The district court thus correctly held that "the Plan was treated no less favorably 'than other comparably

situated plans.'"  SA 33 (quoting *Brotherston* v. *Putnam Invs., LLC*, 907 F.3d 17, 30 (1st Cir. 2018)).

Moreover, courts have declined to find a prohibited transaction "absent some evidence of self-dealing or other disloyal conduct."  *Cunningham* v. *Cornell Univ.*, 2017 WL 4358769, at *10 (S.D.N.Y. Sept. 29, 2017).  Here, there is no such evidence in connection with the Plan's eligibility for revenue sharing under GSAM's agreement with Hewitt, and Plaintiff cites none on appeal.

Plaintiff's three challenges to the rejection of his prohibited-transaction claims come up short.

*First*, Plaintiff contends that PTE 77-3(d), by virtue of its plain language, "is akin to a most-favored-nations clause" that required GSAM to "treat the [P]lan as well as or better than it treats its best customer."  Br. 45.  But Plaintiff cites no authority for this expansive reading of PTE 77-3(d).  In protecting against self-dealing, ERISA's prohibited-transaction rules do not impose liability on a fiduciary for failing to secure benefits for which a plan is ineligible.  Plaintiff cites no evidence suggesting that the Committee failed to pursue available fee rebates from GSAM in an effort to benefit GSAM at Plan participants' expense.

Rather than cite case law to support his reading of PTE 77-3(d), Plaintiff offers an "example" that supposedly "illustrates the point."  Br. 45.  Plaintiff imagines "a financial-services company [that] offers the same mutual fund in two

flavors: a higher-cost version for small-business plans and a lower-cost version for Fortune 500 company plans." *Id*. But this example is of no assistance to Plaintiff. If the plan was *eligible* to invest in the lower-cost version of the fund, but nevertheless chose to invest in the higher-cost version, that may be a prohibited transaction. On the other hand, if the plan was *ineligible* to invest in the lower-cost version (because it is a small-business plan, not a Fortune 500 company plan), then the plan does not violate PTE 77-3(d) by investing in the only version of the mutual fund for which the plan is eligible—the higher-cost version. Similarly here, Defendants are not liable under ERISA for not securing fee rebates for which the Plan was ineligible.

*Second*, Plaintiff argues that the district court's reliance on the First Circuit's *Brotherston* decision is misplaced. Br. 47-48. In *Brotherston*, the First Circuit instructed the district court to consider on remand whether PTE 77-3(d)'s requirement is "satisfied in light of the revenue sharing payments Putnam makes to other plans." 907 F.3d at 30. The First Circuit directed the district court to consider "whether, by not receiving the benefit of such payments, the Plan was treated any less favorably on net than other comparably situated plans." *Id*. Notwithstanding the First Circuit's use of the phrase "other comparably situated plans," Plaintiff contends that "[n]othing in *Brotherston* … warrants narrowing the analysis to include only plans that use the same recordkeeper or began their investment before

a certain date." Br. 48. But that is just another way of arguing that fiduciaries can violate ERISA's prohibited-transaction rules by not securing benefits for which a plan is ineligible. That is not the law.

As support, Plaintiff cites *Cryer* v. *Franklin Resources, Inc.*, 2018 WL 6267856 (N.D. Cal. 2018), but that case is distinguishable. Although the defendants there were aware that "a fifteen bps fee structure" was available to them, they did not pursue that option. *Id*. at *6 (committee was apprised "of various fee structures, and a fifteen bps fee structure was presented as an alternative"). Here, the evidence shows that the Plan was *not* eligible for fee rebates from GSAM. JA500-10; JA3832-33. Plaintiff's reliance on *Moreno* v. *Deutsche Bank Americas Holding Corp.*, 2018 WL 2727880 (S.D.N.Y. 2018), is similarly misplaced. In *Moreno*, the court found that the defendants *satisfied* PT 77-3(d)'s requirements because there was "no evidence that a different and more expensive share class of the funds was offered to the Plan as compared with that offered to other shareholders." *Id*. at *6.

*Third*, Plaintiff argues that "the date on which a third-party plan opened an account with GSAM is irrelevant because the recordkeeping agreement excludes the Plan's assets regardless of the date." Br. 48. To be sure, GSAM's agreement with Hewitt provides, "[f]or the avoidance of doubt," that any fees paid under the agreement "shall exclude the assets of the Goldman Sachs 401(k) Plan." JA510. That language simply makes clear to GSAM's other customers that GSAM is not

-59-

treating Goldman Sachs' Plan *more favorably* than other similarly situated customers. As Alan Wilmit explained, GSAM wanted to avoid the perception that it was "treat[ing] a Goldman Sachs plan better than [its] other similarly situated clients." JA3833.

In short, the district court correctly dismissed Plaintiff's prohibited-transaction claims because the Plan "was treated no less favorably 'than other comparably situated plans.'" SA33.

## IV. The District Court Correctly Rejected Plaintiff's Duty-to-Monitor Claim.

Plaintiff argues that Defendants were not entitled to summary judgment on his duty-to-monitor claim. Br. 49. But a plaintiff "cannot maintain a claim for breach of the duty to monitor … absent an underlying breach of the duties imposed under ERISA." *Rinehart* v. *Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016) (quotation omitted). As the district court held, "[b]ecause this claim is derivative of [Plaintiff's] other claims, it fails for the same reasons." SA33. Plaintiff ignores that part of the district court's ruling.

The district court also properly concluded that "there is no evidence to support" Plaintiff's duty-to-monitor claim because Plaintiff "does not suggest that the Committee members were unqualified or failed to perform their duties." SA33. According to Plaintiff, "the Committee was appointed by Goldman Sachs through its Management Committee." Br. 50. Contrary to Plaintiff's assertion that "[n]o

members of the Management Committee were involved with the Plan in any way until self-interested concerns regarding litigation risk arose in 2016" (*id*.), the evidence shows that the Management Committee discharged its responsibility to appoint and replace Committee members during the class period. JA4155 (replacing Committee member with new member). Plaintiff points to no evidence that the Management Committee failed to appoint qualified Committee members or monitor their performance. The only evidence Plaintiff cites (Br. 50 (citing JA2031)) does not shed any light on the Management Committee's oversight of the Committee.

## CONCLUSION

The judgment should be affirmed.

Dated:   April 27, 2023
         New York, New York

Respectfully submitted,

 /s/ Richard C. Pepperman II
Richard C. Pepperman II
Thomas C. White
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000
peppermanr@sullcrom.com
whitet@sullcrom.com

*Attorneys for Defendants-Appellees*

-61-

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPE-FACE REQUIREMENTS AND TYPE-STYLE
REQUIREMENTS**

The undersigned hereby certifies that this document complies with Local Rule 32(a)(4)(A) because this document contains fewer than 14,000 words. This document contains 13,996 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). The undersigned further certifies that this document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.

April 27, 2023                     /s/ Richard C. Pepperman II
                                   Richard C. Pepperman II

                                   *Attorney for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2023, I caused the foregoing Brief of Defendants-Appellees to be filed electronically using the Court's CM/ECF system. I further certify that all participants in the case are registered CM/ECF users, and that service on all parties will be accomplished electronically by the CM/ECF system. I further certify that I caused six paper copies of the Brief to be delivered to the Court by overnight hand delivery.

 /s/ Richard C. Pepperman II
Richard C. Pepperman II